## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAVID LEE WOMACK,** | : | **CIVIL ACTION NO. 1:06-CV-2348** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **JOSEPH V. SMITH, KENNETH** | : | |
| **GABRIELSON, D. SCOTT DODRILL,** | : | |
| **HARRELL WATTS, and HARLEY G.** | : | |
| **LAPPIN,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Presently before the court is defendants' motion for summary judgment (Doc. 23)[1] with respect to the Eighth Amendment cruel and unusual punishment claim asserted by plaintiff David Lee Womack ("Womack").  For the reasons that follow, the motion will be granted.

## I.     Statement of Facts[2]

Womack is a District of Columbia Code offender who was transferred into federal custody in 2001.  He spent two years at the United States Penitentiary in Leavenworth, Kansas ("USP Leavenworth") before being transferred to the United

---

[1]  The motion is styled as a motion to dismiss or, in the alternative, for summary judgment.  Because the parties have presented the court with numerous "matters outside the pleadings," the motion will be treated as a motion for summary judgment.  See Fed. R. Civ. P. 12(d).

[2]  In accordance with the standard of review for a motion for summary judgment, the court will present the facts in the light most favorable to Womack, the non-moving party.  See infra Part II.

States Penitentiary in Lewisburg, Pennsylvania ("USP Lewisburg") on August 7, 2003. (Doc. 27 ¶¶ 9, 11; Doc. 41 ¶¶ 9, 11.)  The dispute in this case centers around the decision of certain USP Lewisburg officials to place Womack in restraints from December 8, 2004 to January 3, 2005.

### A.    Womack's Institutional History

The propriety of the decision to restrain Womack is best evaluated in the context of Womack's institutional history, the relevant portions of which are set forth here.  During his period of federal incarceration, Womack frequently exhibited disruptive behavior.  While at USP Leavenworth, he received more than fifty disciplinary incident reports for offenses including assault, destruction of property, possession of dangerous weapons, refusal of orders, threats of bodily harm, and self-mutilation.  (Doc. 27 ¶ 12; Doc. 41 ¶ 12.)  He threatened or attempted to commit suicide on at least five occasions.  (Doc. 27 ¶¶ 13, 16, 19, 25, 37, 40; Doc. 41 ¶¶ 13, 16, 19, 25, 37, 40.)  USP Leavenworth officials conducted several mental health evaluations of Womack to determine the root of his misbehavior.  (Doc. 27 ¶¶ 31, 41; Doc. 41 ¶¶ 31, 41.)  These examinations led to the conclusion that Womack had a personality disorder that would be "a management problem wherever he [wa]s housed."  (Doc. 27 ¶¶ 35, 42; Doc. 41 ¶¶ 35, 42.)  Psychology staff also characterized Womack's behavior as "manipulative" and "designed to either change his environment or to elicit a staff response."  (Doc. 27 ¶ 28; Doc. 41 ¶ 28.)

After his transfer to USP Lewisburg, Womack's conduct improved for several months.  (Doc. 27 ¶ 44; Doc. 41 ¶ 44.)  Then, on February 11, 2004, Womack was

placed in the Special Housing Unit ("SHU") after staff received reports that he had stolen property from other inmates. (Doc. 27 ¶ 46; Doc. 41 ¶ 46.) Shortly after his transfer to the SHU, Womack began self-mutilating by cutting his wrists and face on his restraints and on metal portions of his cell. When this behavior persisted, he was moved to a suicide watch cell. (Doc. 27 ¶¶ 47-52; Doc. 41 ¶¶ 47-52.) He informed an institution psychologist that he would continue to harm himself "by cutting, banging his head, or biting himself" and "asked to remain in ambulatory restraints [because] such restraints help him avoid acting on impulses to harm himself." (Doc. 27 ¶¶ 58, 60; Doc. 41 ¶¶ 58, 60.)

Womack's pattern of negative behavior continued for the next six months. During this time, Womack repeatedly attempted to harm himself by cutting his wrists and face on his restraints and cell wall, attempting to hang himself with his jumpsuit, slashing at his wrists, trying to swallow a plastic spoon, and ingesting a large quantity of pills. He also threatened to destroy his cell and began defecating on the floor. He frequently lashed out at staff members by engaging in such incidents as throwing his food tray at one staff member's groin and attempting to spit in another staff member's face. He threatened physical harm to some staff members, while refusing to speak to or acknowledge others. He also hampered prison security efforts by covering the camera and window in his cell. (Doc. 27 ¶¶ 62, 63, 67, 70, 72, 73, 75, 77, 79, 83, 87, 91; Doc. 41 ¶¶ 62, 63, 67, 70, 72, 73, 75, 77, 79, 83, 87, 91.)

## B.    The Restraint Period

On December 8, 2004, Womack was found lying on the floor of his SHU cell. After being moved to the health services area of the institution, he reported that he had fallen while cleaning water in his cell.  He was treated and returned to his cell. (Doc. 27 ¶¶ 93-96; Doc. 41 ¶¶ 93-96.)  The following day, defendant Correctional Officer Kenneth Gabrielson ("Officer Gabrielson") entered Womack's cell and attempted to remove his hand restraints.  Womack lunged backwards and pulled Officer Gabrielson's arm through the food slot.[3]  (Doc. 27 ¶¶ 98-99; Doc. 41 ¶¶ 98-99.) Officer Gabrielson applied hand and leg restraints and a waist chain and escorted Womack to another cell.  (Doc. 27 ¶ 102; Doc. 41 ¶ 102.)  Ultimately, defendant Warden Joseph V. Smith ("Warden Smith") authorized institution staff to keep Womack in ambulatory restraints.[4]  (Doc. 27 ¶ 104; Doc. 41 ¶ 104.)  While Womack was in restraints, he was monitored by medical and correctional staff on a regular basis.  (Doc. 27 ¶ 108; Doc. 41 ¶ 108.)

Beginning on December 10, 2004, Womack's conduct began to degenerate. He repeatedly refused to speak to staff members or to allow them to inspect his

---

[3] Womack alleges that his actions were prompted by his desire not to occupy a broken cell that he believed posed a threat to his safety.  (Doc. 41 ¶¶ 97.1, 97.2.)

[4] Ambulatory restraints are defined by Federal Bureau of Prisons policy as "approved soft and hard restraint equipment which allow the inmate to eat, drink, and take care of basis human needs without staff intervention."  (Doc. 41 ¶ 103.2.) Such restraints "may not be used . . . in a manner that causes unnecessary physical pain or extreme discomfort."  (Id. ¶ 103.1.)  Womack alleges that the restraints did not qualify as ambulatory because they injured him and did not allow him to take care of basic human needs or to lie down in a normal posture.  (Id. ¶¶ 103.3, 103.4.)

restraints.  He tore his bedclothes and used them to cover the window to his cell.

He threw food about his cell, urinated on the floor, directed profanity at staff

members, and flushed his undergarments down the toilet.  (Doc. 27 ¶¶ 109-111, 114,

117, 119-120; Doc. 41 ¶¶ 109-111, 114, 117, 119-120.)  On December 16, 2004, Womack

told staff members that they were "fucked up for not putting him in restraints

earlier."  (Doc. 27 ¶ 118; Doc. 41 ¶ 118.)  The next day, he told staff members that

they would "be sorry" if they removed his restraints.  (Doc. 27 ¶ 119; Doc. 41 ¶ 119.)

Four days later, on December 21, 2004, he told staff that the situation would "get

worse before it gets better" and that he intended to "stay in restraints."  (Doc. 27

¶ 123; Doc. 41 ¶ 123.)  On the same day, he was evaluated by a staff psychologist who

confirmed that he was suffering from a personality disorder and noted that his

actions appeared to be "purposeful and calculated" attempts to exert control over

his situation.  (Doc. 27 ¶¶ 125-126; Doc. 41 ¶¶ 125-126.)  Womack made clear to the

psychologist that he intended "to remain disruptive."  (Doc. 27 ¶ 125; Doc. 41 ¶ 125.)

On December 22, 2004, Womack complained about the circulation in his

wrists and was evaluated by medical staff.  (Doc. 27 ¶ 127; Doc. 41 ¶ 127.)

Thereafter, medical staff periodically loosened Womack's restraints and cleaned

and bandaged his wrists, at one point noticing a "mild swelling."  (Doc. 27 ¶¶ 131,

133, 137, 146-147; Doc. 41 ¶¶ 131, 133, 137, 146-147.)  Yet again, Womack's negative

conduct resumed.  He refused to acknowledge staff and covered his restraints to

prohibit inspection.  He "urinated and defecated in the cell and smeared feces on

the cell bars and walls" and then refused orders to clean his cell.  (Doc. 27 ¶¶ 129-

130, 134-135, 139-140, 145, 147; Doc. 41 ¶¶ 129-130, 134-135, 139-140, 145, 147.)  At one point, he told staff members that he would only leave the cell in a "body bag" and that they should "stop knocking on [his] door and leave [him] the fuck alone." (Doc. 27 ¶ 134; Doc. 41 ¶ 134.)  By December 30, 2004, he had begun declaring that he was "wearing these chains for the people of Africa" and would wear them "for fifty days before [going] back to a regular cell without a radio."  (Doc. 27 ¶ 141; Doc. 41 ¶ 141.)  The following day, he refused medical staff's attempts to check his restraints and wrist wounds, telling them to "eat shit" and stating "you punk asses think you can break me but I'm not going to break."  (Doc. 27 ¶ 144; Doc. 41 ¶ 144.)

On January 3, 2005, Warden Smith ordered Womack's restraints removed after Womack "agreed to attempt to conform his behavior to Bureau of Prisons rules."  (Doc. 27 ¶¶ 148, 150; Doc. 41 ¶¶ 150, 150.1.)  Medical staff evaluated Womack and determined that his only injuries were minor abrasions on his wrist and left ankle, which did not require medical attention.  (Doc. 27 ¶ 149; Doc. 41 ¶ 149.)  For thirty days after Womack's release from restraints, he was kept in high-security solitary confinement.  (Doc. 41 ¶ 1.8.)  On February 4, 2005, he was placed in a cell with a cell mate.  (Id. ¶ 1.11.)

### C.    **Exhaustion of Administrative Remedies**

Shortly after receiving a cell mate, Womack requested the materials necessary to file a grievance, which he received on February 19, 2005.  (Id. ¶¶ 1.13, 1.14; Doc. 42 at 4; Doc. 40, Ex. A at 5.)  On March 3, 2005, he filed an informal grievance alleging that his shackling constituted cruel and unusual punishment.

Federal Bureau of Prison ("BOP") officials responded five days later.  (Doc. 41 ¶¶ 1.16, 1.17.)  On March 13, 2005, Womack filed a formal grievance, which was answered for "informational purposes only" on April 1, 2005.  (Doc. 27 ¶¶ 2-3; Doc. 41 ¶¶ 2-3.)  On April 5, 2005, he appealed to the BOP northeast regional office, which denied his request as untimely on May 3, 2005.  On May 7, 2005, he appealed to the BOP central office, which denied his request as untimely on July 20, 2005. (Doc. 27 ¶¶ 4-8; Doc. 41 ¶¶ 4-8.)

Each of Womack's grievances and appeals were prepared by his cell mate because Womack is illiterate.  (Doc. 40, Ex. A at 4.)  In a sworn declaration, Womack stated that he has relied on other inmates to read and write for him throughout his incarceration and that he has never trusted prison officials to do so.  (Id.) Accordingly, Womack maintains that he was unable to complete a grievance until he was placed in cell with a cell mate.  He states that, during his period of solitary confinement, he "refused to have prison officials complete a grievance form for [him] because of the necessary conflict relating to [his] grievance against the prison officials."  (Id. at 5.)

## D.   Procedural History

On December 27, 2006, Womack filed the instant action, asserting a claim of cruel and unusual punishment pursuant to the Eighth Amendment to the United

States Constitution.  (See Doc. 1.)  Defendants[5] filed the instant motion for

summary judgment, arguing that:  (1) Womack failed to exhaust his administrative

remedies, (2) his treatment does not constitute cruel and unusual punishment, and

(3) the doctrine of qualified immunity insulates defendants from liability.  (See

Doc. 23.)  The motion has been fully briefed and is ripe for disposition.

## II.    <u>Standard of Review</u>

Through summary adjudication the court may dispose of those claims that do

not present a "genuine issue as to any material fact" and for which a jury trial

would be an empty and unnecessary formality.  See FED. R. CIV. P. 56(c).  It places

the burden on the non-moving party to come forth with "affirmative evidence,

beyond the allegations of the pleadings," in support of its right to relief.  Pappas v.

City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see

also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be

adequate, as a matter of law, to sustain a judgment in favor of the non-moving party

on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986);

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see

also FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action

proceed.  Pappas, 331 F. Supp. 2d at 315.

---

[5]  Defendants include Officer Gabrielson and Warden Smith, as well as three
BOP officials, namely, BOP Director Harley G. Lappin, BOP Northeast Regional
Director D. Scott Dodrill, and BOP Appeals Administrator Harrell Watts.  (Doc. 1
¶¶ 3-7.)

III.   **Discussion**

Defendants allege that Womack failed to exhaust his administrative remedies

with respect to his cruel and unusual punishment claim as required by the Prison

Litigation Reform Act of 1995 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996).[6]

The PLRA requires a prisoner to present his claims through an administrative

grievance process before seeking redress in federal court.  The Act specifically

provides as follows:

> No action shall be brought with respect to prison conditions under
> section 1983 of this title, or any other Federal law, by a prisoner
> confined in any jail, prison, or other correctional facility until such
> administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  A prisoner must comply with the exhaustion requirement as to

*any* claim that arises in the prison setting, regardless of the nature of the claim or of

the relief sought.  See Porter v. Nussle, 534 U.S. 516, 532 (2002) ("[T]he PLRA's

exhaustion requirement applies to all inmate suits about prison life, whether they

involve general circumstances or particular episodes, and whether they allege

excessive force or some other wrong."); Booth v. Churner, 532 U.S. 731, 741 n.6

(2001) ("[A]n inmate must exhaust irrespective of the forms of relief sought and

offered through administrative avenues.").  "[I]t is beyond the power of [any] court

. . . to excuse compliance with the exhaustion requirement, whether on the ground

of futility, inadequacy or any other basis."  Nyhuis v. Reno, 204 F.3d 65, 73 (3d Cir.

---

[6]  Failure to exhaust is an affirmative defense for which defendants bear the
burden of proof.  Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002).

2000) (citing <u>Weinberger v. Salfi</u>, 422 U.S. 749, 766 (1975)); <u>see also</u> <u>Nyhuis</u>, 204 F.3d at 71 (stating that the PLRA "completely precludes a futility exception to its mandatory exhaustion requirement").

The PLRA mandates that a prisoner "properly" exhaust his or her administrative remedies before commencing suit in federal court. <u>Woodford v. Ngo</u>, 548 U.S. 81, 126 S. Ct. 2378, 2387 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." <u>Id.</u> at 2386. Such requirements "eliminate unwarranted federal-court interference with the administration of prisons, and thus seek[] to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'" <u>Id.</u> at 2387 (quoting <u>Porter</u>, 534 U.S. at 525). Failure to comply with procedural requirements of the applicable prison's grievance system will result in a procedural default of the claim. <u>Spruill v. Gillis</u>, 372 F.3d 218, 227-32 (3d Cir. 2004) ("[P]rison grievance procedures supply the yardstick for measuring procedural default."). Procedural default is a question of law. <u>Id.</u> at 232.

When determining whether a prisoner has exhausted his or her administrative remedies, a court must consider:  (1) whether the prisoner has exhausted his or her administrative remedies "in the literal sense," in other words, "whether further avenues of relief are available to him [or her] within the prison's

inmate grievance process," and (2) whether the prisoner has procedurally defaulted his or her claims. Id. The court will address these inquiries *seriatim*.

## A. Exhaustion in the Literal Sense

The procedure to be utilized by federal inmates like Womack is the administrative remedy protocol established by the BOP and set forth at 28 C.F.R. §§ 542.10 - 542.19. Pursuant to this protocol, an inmate must first present his complaint to a staff member, who must attempt to informally resolve the issues asserted before the inmate files a request for administrative relief. Id. § 542.13(a). If informal resolution fails, the inmate may raise his complaint with the warden of the institution where he is confined. Id. § 542.14(a). If dissatisfied with the response, he may then appeal an adverse decision to the regional and the central offices of the BOP. Id. §§ 542.15(a), 542.18. No administrative appeal is considered finally exhausted until a decision is reached on the merits by the BOP central office. Id. § 542.15.

Between March 3, 2005 and May 7, 2005, Womack pursued each of the four levels of administrative review, beginning with an informal grievance and ending with an appeal to the BOP central office. Womack's request for relief was denied at each of these four stages. Accordingly, no avenues of relief remain open to Womack, and he has "literally" exhausted his administrative remedies.

## B. Procedural Default

Having found that no administrative remedies remain available to Womack, the court turns next to the question of procedural default. Defendants contend that

Womack procedurally defaulted his claims by failing to file his grievance in a timely manner.  (Doc. 26 at 8.)  According to BOP protocol, an inmate has twenty calendar days from the date on which the basis for a remedy request occurred to initiate that remedy request with the warden of the institution where the inmate is confined.  28 C.F.R. § 542.14; see also Jetter v. Beard, 183 F. App'x 178, 180 (3d Cir. 2006) (finding procedural default where prisoner failed to timely file his initial grievance). Womack concedes that he failed to file his initial grievance within twenty days, but argues that his failure should be excused because no administrative remedies were "available" to him at the time of the filing deadline.  (Doc. 40 at 32); see 42 U.S.C. § 1997e(a); Camp v. Brennan, 219 F.3d 279, 281 (3d Cir. 2000) (asserting that under the PLRA, a prisoner need only exhaust such administrative remedies as are "available"); Brown v. Croak, 312 F.3d 109, 111 (3d Cir. 2002) (same).[7]  Specifically, Womack argues that no administrative remedies were available to him because:  (1) he was unaware of the twenty day filing deadline for an initial grievance, (2) he was illiterate and was not provided with a cell mate to prepare his grievance until well after the expiration of the twenty day period, and (3) prison officials failed to

---

[7]  The "availability of administrative remedies to a prisoner is a question of law."  Mitchell v. Horn, 318 F.3d 523, 529 (3d Cir. 2003); see also Oliver v. Moore, 145 F. App'x 731, 734.

provide him with grievance forms in a timely fashion.[8]  The court will address

Womack's arguments *seriatim*.

### 1.   Womack's Lack of Knowledge of the Twenty Day Deadline

Courts have invariably held that affirmative misconduct by prison officials –

designed to impede or prevent an inmate's attempts to exhaust – may render

administrative remedies unavailable.  See Todd v. Benning, 173 F. App'x 980, 982-

83 (3d Cir. 2006) (expressing approval of Eighth Circuit's holding in Miller v. Norris,

247 F.3d 736 (8th Cir. 2001) that administrative remedies were not available where

prison officials "purportedly prevented prisoner from employing the prison's

---

[8]  Relying on a decision rendered by the Eastern District of Kentucky in Martin v. Sizemore, No. 05-105, 2005 WL 1491210 (E.D. Ky. June 22, 2005), Womack also claims that defendants are equitably estopped from asserting Womack's failure to exhaust as a defense because the prison's grievance system required Womack to rely upon prison officials to file his grievance. (See Doc. 40 at 35.)  The Third Circuit has never held that the affirmative defense of failure to exhaust is subject to the doctrine of equitable estoppel.  Hill v. Smith, 186 F. App'x 271, 274 (3d Cir. 2006).  Even if the doctrine was applicable, defendants would not be equitably estopped because, unlike the plaintiff in Martin, Womack never attempted to utilize the prison's grievance system within the twenty day period.  2005 WL 1491210, at *4. Accordingly, there is no evidence that defendants' actions "inhibited [Womack's] access to administrative remedies."  Id. at *3.

grievance system").[9]  However, there is a split of authority on whether a correctional institution's failure to provide an inmate with sufficient information about his or her administrative remedies may render those remedies unavailable.

Several district courts have held that, under certain circumstances, an inmate's subjective lack of information about his or her administrative remedies may excuse a failure to exhaust.  See, e.g., Blount v. Boyd, No. 05-643, 2006 WL 2381968, at *2 (W.D. Va. Aug. 17, 2006); Andrews v. State of Maryland, No. 04-396, 2004 WL 3262745, at *2 (D. Md. June 3, 2004); Arnold v. Goetz, 245 F. Supp. 2d 527, 537-38 (S.D.N.Y. 2003) ("[A]n institution keeps an inmate ignorant of the grievance procedure when correctional officials either fail to inform him of the procedure altogether or fail to provide him with access to materials which could otherwise educate him about use of that process."); Hall v. Sheahan, No. 00-1649, 2001 WL 111019, at *2 (N.D. Ill. Feb. 2, 2001) ("[A]n institution cannot keep inmates in ignorance of the grievance procedure and then fault them for not using it.").

---

[9] Examples of affirmative misconduct on the part of prison officials include: (1) threatening a prisoner in an attempt to thwart the prisoner's attempts to exhaust, see, e.g., Harcum v. Shaffer, No. 06-5326, 2007 WL 4167161, at *5 (E.D. Pa. Nov. 21, 2007) (finding administrative remedies unavailable where prison officials threatened plaintiff with "opposition to his future prerelease application, parole, or outside work detail if he did not withdraw his grievance"), (2) refusing to provide appropriate grievance forms in response to inmate inquiries, see, e.g., Mitchell, 318 F.3d at 529, (3) advising an inmate that his or her situation does not require a grievance, see, e.g., Brown, 312 F.3d at 111 (finding that administrative remedies were unavailable to plaintiff who had been advised by prison official that he must wait until the end of the prison's investigation before filing a grievance), and (4) failing to file or respond to a prisoner's grievances, see, e.g., Camp, 219 F.3d at 280-81 (finding that administrative remedies were unavailable where prison officials refused to file plaintiff's grievances regarding their coworkers).

However, the majority view provides that an inmate's subjective lack of knowledge

of a grievance procedure does not excuse a failure to exhaust.  When determining

whether an administrative remedy is available, the Second, Sixth, Seventh, Eighth,

and Eleventh Circuits have opted for an objective test that asks whether a

"similarly situated individual of ordinary firmness" would have deemed a particular

remedy to be available.  Hemphill v. New York, 380 F.3d 680, 688 (2d Cir. 2004); see

also Goebert v. Lee County, 510 F.3d 1312, 1323 (11th Cir. 2007); Kaba v. Stepp, 458

F.3d 678, 684 (7th Cir. 2006); Brock v. Kenton County, KY, 93 F. App'x. 793, 798 (6th

Cir. 2004); Castano v. Nebraska Dep't of Corrections, 201 F.3d 1023, 1025 (8th Cir.

2000).  In adopting the objective test, the Eighth Circuit observed:

> [The PLRA] says nothing about a prisoner's subjective beliefs, logical or
> otherwise, about the administrative remedies that might be available to him.
> The statute's requirements are clear:  If administrative remedies are
> available, the prisoner must exhaust them. . . . "[W]e are not free to engraft
> upon the statute an exception that Congress did not place there."

Castano, 201 F.3d at 1025; see also Brock, 93 F. App'x at 798; Cooper v. Rothstein,

No. 04-8164, 2007 WL 1452989, at *2 n.1 (N.D. Ill. May 17, 2007).  Using such an

objective test, several courts have held that a prisoner's subjective lack of

knowledge about his or her administrative remedies is irrelevant to the PLRA's

availability inquiry and that, as a result, prison officials are under no affirmative

duty to notify prisoners of available administrative remedies.  Brock, 93 F. App'x. at

798; Twitty v. McCoskey, 226 F. App'x 594, 596 (7th Cir. 2007) ("A prisoner's lack of

awareness of a grievance procedure . . . does not excuse compliance."); Gonzales-

Liranza v. Naranjo, 76 F. App'x 270, 272-73 (10th Cir. 2003) (finding that prisoner's

15

unawareness of institutional grievance procedures did not excuse PLRA exhaustion requirement); <u>Yousef v. Reno</u>, 254 F.3d 1214, 1221 (10th Cir. 2001) (rejecting prisoner's argument that the Assistant Attorney General was obligated to advise him of the need to follow BOP administrative procedures).

The court is persuaded that the Third Circuit would adopt a similar interpretation of the PLRA and would refuse to add a subjective component to the statute where one does not exist.  Under the objective test, Womack's subjective lack of knowledge about the deadline for his initial grievance is irrelevant to the availability inquiry and does not excuse Womack's failure to exhaust.

Assuming *arguendo* that the Third Circuit were to permit an inquiry into a prisoner's subjective knowledge before determining the availability of his or her administrative remedies, the evidence of record suggests that Womack was well aware of his administrative remedies in the instant case.  Even those courts that utilize a subjective test have stated that "correctional officials are entitled to the benefit of [the PLRA] as long as the institution has made a reasonable, good faith effort to make the grievance procedure available to inmates; an inmate may not close his eyes to what he reasonably should have known."  <u>Arnold</u>, 245 F. Supp. 2d at 537 (quoting <u>Hall</u>, 2001 WL 111019, at *2); <u>see also</u> <u>Andrews</u>, 2004 WL 3262745, at *2; <u>Russell v. Unknown Cook County Sheriff's Officers</u>, No. 03-3786, 2004 WL 2997503, at *4 (N.D. Ill. Dec. 27, 2004) ("An inmate cannot avoid a motion to dismiss if conclusive evidence indicates that his alleged ignorance of the grievance procedure was due to his own willful blindness.  If an inmate was provided with

16

unambiguous information about the procedure, he cannot . . . claim that he lacked notice.").

In the instant case, defendants made a reasonable, good faith effort to inform Womack of the grievance procedure by providing him with an inmate handbook that detailed the procedure.  See Andrews, 2004 WL 3262745, *2-3 (holding that provision of inmate handbook containing grievance procedure constituted a "reasonable, good faith effort to inform the Plaintiffs of their administrative remedies"); see also Russell, 2004 WL 2997503, at *4 (stating that "correctional officials may offer reasonable notice by simply providing inmates with an informational handbook outlining the grievance procedure").  Womack signed an intake screening form acknowledging his receipt of the handbook upon his arrival at USP-Lewisburg.  (Doc. 42, Ex. A at 1-5.)  He cannot now ignore the contents of the handbook and claim a lack of awareness of the prison's grievance procedures.  See White v. Harris, No. 04-265, 2005 WL 2266658, at *3 (E.D. Ky. Sept. 16, 2005) (concluding that plaintiff's signature on intake documents demonstrated that he was advised of the prison's grievance procedures and refuted his claim that administrative remedies were unavailable to him).  Moreover, Womack successfully utilized the prison grievance procedure on *thirty-four prior occasions* beginning in October of 2001.  (Doc. 42, Ex. A at 1, 6-7.)  The court finds his claim that he was unaware of the grievance deadlines despite his prolific use of the procedure to be specious.  See Blount, 2006 WL 2381968, at *5 (finding that an inmate who had "filed forty acceptable regular grievance forms" in a five year period could not rely

upon his lack of knowledge about the grievance process to establish that his administrative remedies were unavailable); see also Akright v. Graves, No. 05-821, 2006 WL 2947323, at *6 (E.D. Wis. Oct. 16, 2006) (finding that plaintiff's filing of numerous grievances during his period of incarceration undermined his "self-serving assertion" that he was unaware of the grievance procedure).  Accordingly, the court finds that Womack's failure to exhaust would not be excused even if a subjective test for availability of administrative remedies was applied.

### 2.    **Womack's Illiteracy**

Womack also claims that his administrative remedies were unavailable because he is illiterate and was in a cell without a cell mate during the entire twenty day period that was allotted for the preparation of his grievance.  Womack states that he has never trusted prison officials to read and write for him during his period of incarceration and that, during his period of solitary confinement, he "refused to have prison officials complete a grievance form for [him] because of the necessary conflict relating to [his] grievance against the prison officials."  (Doc. 40, Ex. A at 4-5.)  Accordingly, Womack maintains that his failure to exhaust should be excused because he was unable to prepare a grievance until he was placed in a cell with a cell mate.

Prison wardens are required to "ensure that assistance is available for inmates who are illiterate."  28 C.F.R. § 542.16(b).  However, an illiterate inmate must have asked for and been refused assistance in pursuing his administrative remedies before his illiteracy may excuse his failure to exhaust.  See Ramos v.

<u>Smith</u>, 187 F. App'x 152, 154 (3d Cir. 2006) (citing 28 C.F.R. § 542.16(b)) (holding that exhaustion was not excused where illiterate prisoner did "not claim that he asked for and was refused assistance in filing his administrative appeals").  In the instant case, it is undisputed that Womack did not ask for assistance in pursuing his administrative remedies.  To the contrary, Womack's sworn testimony confirms that he was distrusting of all prison officials and refused to ask them for help in preparing his grievances.  Having refused to ask for assistance from the resources that were available to him, Womack cannot now seek safe harbor in the fact that he was unable to prepare his grievances himself.  Accordingly, Womack's illiteracy does not excuse his failure to exhaust.

### 3.    <u>Failure to Provide Forms</u>

Womack also argues that prison officials caused his failure to exhaust by delaying the provision of necessary grievance forms.  <u>See</u> <u>Mitchell v. Horn</u>, 318 F.3d 523, 529 (3d Cir. 2003) (finding that prison officials' refusal to provide an inmate with requested grievance forms may excuse a failure to exhaust).  Womack admits, however, that he did not request the appropriate grievance forms until shortly after he had received a cell mate on February 4, 2005.  Because the twenty day period for timely exhaustion expired on January 23, 2005, the alleged failure to provide forms is immaterial and does not excuse Womack's failure to exhaust.

For the foregoing reasons, the court finds that Womack failed to utilize administrative remedies that were to available to him and that, as a result, he has

procedurally defaulted his Eighth Amendment cruel and unusual punishment

claim.

## IV.   <u>Conclusion</u>

Having found that Womack has failed to exhaust his administrative remedies

with respect to his Eighth Amendment cruel and unusual punishment claim, the

court will grant defendants' motion for summary judgment.[10]

---

[10]   Assuming *arguendo* that Womack had properly exhausted, the court finds
that his cruel and unusual punishment claim would fail for lack of evidence that
defendants acted with deliberate indifference toward his health and safety.  The
Eighth Amendment guarantees that individuals will not be subjected to "cruel and
unusual punishments."  U.S. Const. amend. VIII.  In the prison setting, this
provision prohibits officials from acting with "deliberate indifference" towards a
"substantial risk of serious harm to an inmate."  <u>Farmer v. Brennan</u>, 511 U.S. 825,
828, 832-34 (1994).  Deliberate indifference can be established only by proof that a
prison official knew of and chose to disregard an "excessive risk to inmate health or
safety."  <u>Id.</u> at 837.  To be liable, a prison official must have:  (1) been subjectively
"aware of facts from which the inference could be drawn that a substantial risk of
serious harm exist[ed]," and (2) actually reached that inference.  <u>Id.</u>
     In the instant case, Womack alleges that defendants knew of and chose to
disregard the serious risk of medical harm posed by his restraints.  The summary
judgment record reveals overwhelming evidence to the contrary.  While Womack
was restrained, prison officials repeatedly checked his restraints despite Womack's
active resistance.  Womack also advised staff members that they should have placed
him in restraints earlier and that there would be repercussions if they removed his
restraints.  When Womack complained that the restraints were hindering
circulation in his wrists, he was immediately checked by medical staff and treated
on a regular basis.  Shortly thereafter, prison officials removed Womack's restraints
when he finally agreed to conform his conduct to appropriate standards.  Given
Womack's institutional history and the obvious safeguards implemented by the
prison to protect Womack, the court finds that a reasonable jury could not conclude
that defendants were deliberately indifferent to a serious risk posed by his
restraints.  To the contrary, prison officials appropriately balanced Womack's
interests against the need to safeguard other inmates and staff from Womack's
egregious misbehavior.

An appropriate order will issue.

       S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Dated:      March 26, 2008

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVID LEE WOMACK,** | : | **CIVIL ACTION NO. 1:06-CV-2348** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **JOSEPH V. SMITH, KENNETH** | : | |
| **GABRIELSON, D. SCOTT DODRILL,** | : | |
| **HARRELL WATTS,** and **HARLEY G.** | : | |
| **LAPPIN,** | : | |
| | : | |
| **Defendants** | : | |

## <u>ORDER</u>

AND NOW, this 26th day of March, 2008, upon consideration of defendants'

motion for summary judgment (Doc. 23), and for the reasons set forth in the

accompanying memorandum, it is hereby ORDERED that:

1. The motion for summary judgment (Doc. 23) is GRANTED.

2. The Clerk of Court is directed to enter JUDGMENT in favor of defendants Joseph V. Smith, Kenneth Gabrielson, D. Scott Dodrill, Harrell Watts, and Harley G. Lappin and against plaintiff David Lee Womack.

3. The Clerk of Court is directed to CLOSE this case.

                                __S/ Christopher C. Conner__
                                CHRISTOPHER C. CONNER
                                United States District Judge