PJS:MJB:dlm

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVID LEE WOMACK,** | : | NO.  1:CV-06-2348 |
| **Plaintiff** | : | |
| | : | **(Conner, J.)** |
| **v.** | : | |
| | : | |
| **HARLEY LAPPIN, et al.,** | : | |
| **Defendants** | : | **Filed Electronically** |

**STATEMENT OF MATERIAL FACTS**
**IN SUPPORT OF DEFENDANTS'**
**MOTION  FOR SUMMARY JUDGMENT**

Defendants D. Scott Dodrill, Joseph V. Smith, Kenneth Gabrielson, and

John Oliver hereby file this statement of material facts in support of their motion

for summary judgment.  Defendants state as follows:

1.      David Lee Womack came into BOP custody from the custody of the

District of Columbia.  See Declaration of L. Cunningham (Ex. 1 to

Doc. No. 79) ¶ 2; Sentence Data (Attach. 1 to Ex. 1) .

2.      From June 28, 2001 to February, 4, 2003, Womack was housed at

Leavenworth United States Penitentiary, Leavenworth, Kansas ("USP

Leavenworth").  See Inmate History (Attach. 2 to Ex. 1).

3.      On August 7, 2003, Womack was designated to the Lewisburg United

States Penitentiary, Lewisburg, Pennsylvania ("USP Lewisburg").

See id.

**FACTS REGARDING EXHAUSTION**

4.      On June 28, 2001, February 4, 2003, June 24, 2003, and August 7,

2003, the BOP provided Womack with a handbook entitled

"Admissions & Orientation Booklet"  defining his "Rights &

Responsibilities" and the "Prohibited Acts and Disciplinary Severity

Scale."  See Cunningham Decl. ¶ 2 (Ex. 1 to Doc. No. 79); Intake

Screening Forms (Ex. A).

5.      Womack testified that he received the Admissions & Orientation

Booklet from USP Lewisburg and signed the intake screening forms.

See Deposition of David Lee Womack (Ex. B) at 231 ¶ 19 to 234 ¶

15; Intake Screening Forms (Ex. A).

6.      This handbook detailed the administrative remedy procedures of the

BOP.  See USP Lewisburg Handbook (Ex. C).

7.      Since October  2001, Womack has filed thirty-four requests for

administrative remedies.  See Cunningham Declaration ¶ 3 (Ex. 1 to

Doc. 79).

8.    Womack testified that prior to incident described in his complaint, a correctional officer punched him in the face. See Womack Dep. (Ex. B) at 125 ¶ 3 to 127 ¶ 23.

9.    Womack testified that his cell mate at the time of the alleged punch did not want to fill out an administrative remedy because of fear of retaliation, and when the cell mate left, he had no one else to help him file an administrative remedy and "the time frame had passed." See id. at 128 ¶ 10 to 130 ¶ 6.

10.    Womack testified to another alleged assault prior to this incident and claimed that the same correctional officer threw coffee in his face. See id. at 130 ¶ 7 to 131 ¶ 4.

11.    Womack claimed that after the alleged assault with the coffee, he had to go to the hospital and thereafter was kept in ambulatory restraints for "like six days." See id. at 131 ¶¶ 16-22.

12.    Womack testified that he did not file a administrative remedy against this correctional officer who allegedly threw coffee on him "[b]ecause the time frame had passed." See id. at 131¶ 23 ¶ 132 ¶ 2.

13.    Womack testified that he appeared before a Disciplinary Hearing Officer (DHO) and he was told of his appeal rights regarding the DHO's finding. See id. at 229 ¶ 8 to 230¶ 10.

14.    The DHO advices inmates "of his right to appeal th[e] action within

20 calendar days under the Administrative Remedy Procedure." <u>See,</u>

<u>e.g.,</u> 02/04/05 DHO Report (Ex. D).

15.    Womack's sworn testimony provides "[w]hile incarcerated, I have

relied on former inmates to read and write for me. I do not trust

prison officials to read and write for me." <u>See</u> Declaration of David

Lee Womack (Ex. E) ¶ 16.

16.    Womack's sworn testimony also provides:

From the time I was removed from restraints on January 3, 2005, until
February 4, 2005, USP Lewisburg officials kept me in high security
solitary confinement. I had no access to any other inmates during this
period. I refused to have prison officials complete a grievance form
for me, because of the necessary conflict relating to my grievance
against the prison officials. I could only trust another inmate to fill
out a grievance on my behalf.

<u>See</u> <u>id.</u> ¶ 21.

17.    At his deposition, Womack testified:

Q.   What's solitary confinement?

A.   That's to mean, what's my definition of that?

Q.   Do they have solitary confinement in the BOP?

A.   I don't know if they call it solitary confinement. I don't
understand that question.

Q.   Do you use the word "solitary confinement" when you talk about
being locked down in the BOP?

A.  No.

. . .

Q.  What does that mean?

A.  Solitary confinement.  'Finement, 'finement, 'finement.

. . .

THE WITNESS:  Solitary confinement. 'Finement, 'finement, 'finement. "Solid" [sic] is something that's secure. 'Finement.  'Finement.  Is that -- it's not 'finement.  You're saying 'finement.  'Finement.  Sound like 'finement. Solitary confinement.

Womack Dep. (Ex. B) at 235 ¶ 3 to 237 ¶ 14.

18.  Contrary to the declaration, Womack testified when he was released from restraints he was placed in a cell next to another cell that contained two inmates.  Womack did not ask these inmates for assistance in completing his administrative remedies.  See id. at 244 ¶ 17 to 245 ¶ 11.

19.  Womack testified the day he received a cell mate on February 4, 2005, staff informed him that they did not have any BP 8s or 9s, but "Tim Tim" an inmate across the tier yelled to him that he should file a BP 10, so rather than pursue a BP 8 or 9, Womack took the advice of "Tim Tim" and submitted a BP 10, and tore up the BP 10 once it was

rejected.    See id. at 260 ¶¶ 15-24, at 272 ¶¶ 2-22.

20.    Womack's Correctional Counsellor, Unit Manager, and Case

Manager all visited the SHU and declared that if Womack requested

forms from them, they would have provided the forms to him in the

SHU.  See Declaration of G. Ulsh (Ex. F); Declaration of D.

Hollenback (Ex. G); Declaration of J. Lincalis (Ex. H); Declaration of

W. Zegarski (Ex. I).

21.     On February 7, 2005, Womack "sent a sensitive BP 10 to the

regional office," the Region rejected it as not sensitive, and Womack

tore up his BP10 and prepared a BP8.   See 02/14/07 Letter to Norton

(Ex. J); Womack Dep. (Ex. B) at 265 ¶ 12 to 272 ¶ 23.

22.    On March 3, 2005, Womack submitted an informal resolution,

claiming he was in ambulatory restraints for twenty-six days.  See

03/03/05 BP 8 (Ex. K).

23.    The BP8 form that Womack submitted on March 3, 2005 contains a

reference to Program Statement 1330.  See id.

24.    Womack admitted he can read numbers.  See Womack Dep. (Ex. B) at

228 ¶¶ 14-19.

25.    Program Statement 1330, effective August 6, 2002, provides in

pertinent part: "The deadline for completion of informal resolution

and submission of a formal written Administrative Remedy Request, on the appropriate form (BP-9), is 20 calendar days following the date on which the basis for the Request occurred." Program Statement 1330.16 (Ex. L) at 6 ¶ 8a.

26.    On March 4, 2005, BOP staff provided a memo to Womack, informing him that he did not request a remedy, informing him that it was neither denied nor any issues granted to you, and asking him to be more specific in what issues he wanted resolved or addressed. See 03/04/05 Whitecavage Memo (Ex. M).

27.    Womack did not resubmit a BP8 pursuant to the March 4, 2005 request.

28.    On March 13, 2005, Womack filed a BP-9, administrative remedy number 370486-F1, with the institution regarding restraints that staff had placed on Womack between December 9, 2004, and January 3, 2005. See 03/13/05 BP9 (Ex. N).[1]

---

[1] The BP-9 is a part of the BOP Administrative Remedy Procedure. The BOP has established an Administrative Remedy Procedure through which an inmate can seek formal review of any complaint regarding any aspect of his imprisonment. See 28 C.F.R. § 542. This process is commenced by presenting, "an issue of concern informally to staff, and staff shall attempt to informally resolve the issue." 28 C.F.R. § 542.13(a). If the attempt to informally resolve is not successful, the inmate may submit a Request for Administrative Remedy to the Warden of the facility within 20 calendar days of the date on which the basis for the request occurred (the "BP-9"). See 28 C.F.R. § 542.14(a).

If an inmate is dissatisfied with the Warden's response, that inmate may

29.    Womack's deadline for filing an administrative remedy was twenty days from January 3, 2005, which would have been January 23, 2005.

30.    Warden Smith, noting Womack did not request a remedy, provided Womack with a response to his remedy for "informational purposes only" on April 1, 2005. See 04/01/05 BP 9 Response (Ex. O).

31.    On April 5, 2005, Womack filed a BP10 appeal to the Northeast Regional Office on April 5, 2005. See 04/05/05 BP 10 (Ex. P).

32.    The Northeast Regional Director at the time, Defendant Dodrill, delegated the responsibility of reviewing and responding to administrative remedies to the Northeast Regional Counsel. See Cunningham Decl. (Ex. 1 to Doc. No. 79) ¶ 5.

33.    On May 3, 2005, the Northeast Regional Counsel denied Womack's remedy appeal because his original claim was untimely, and did not address the merits. See 05/03/05 BP10 Response (Ex. Q).

34.    On May 7, 2005, Womack filed a BP11 appeal to the Central Office. See 05/07/05 BP11 (Ex. R).

---

submit an appeal to the Regional Director within 20 calendar days of the date the Warden signed the response. See id. Similarly, an inmate may appeal the decision of the Regional Director to the BOP General Counsel within 30 days of the date on which the Regional Director signed the response. See id. An Administrative Remedy is not considered to have been fully exhausted unless it has been denied on the merits at each level of review. See id.; see also Program Statement 1330.16 (Ex. L); USP Lewisburg Handbook (Ex. C).

35.    On July 20, 2005, the Central Office denied the appeal because Womack's original claim was untimely. <u>See</u> 07/20/05 BP11 Response (Ex. S).

36.    Womack has written to his lawyer, and his lawyer has written to him back. <u>See</u>, <u>e.g.</u>, Letters to Attorneys (Ex. T).

37.    Womack has written letters to his family and members of Congress. <u>See</u> 02/14/05 Letter to Norton (Ex. J); Letter to Sister (Ex. U).

38.    When Womack needs help with spelling or particular code provision, he will yell to his fellow inmates for help, and they will provide him with that assistance. <u>See</u> Womack Dep. (Ex. B) at 242 ¶ 25 to 243 ¶ 16, at 260 ¶¶15-24.

39.    Womack has not had a cell mate since he left USP Lewisburg. <u>See</u> <u>id.</u> at 314¶¶ 20-23.

40.    Womack testified that Warden Smith knew he was illiterate because Warden Smith allegedly told Gabrielson to tell Womack that "if I have a issue, for him to come and deal with it because of my literacy." <u>Id.</u> at 124 ¶ 5-11.

## <u>WOMACK'S PREVIOUS ADMISSIONS</u>

41.    During Womack's incarceration at USP Leavenworth, Womack received in excess of 50 disciplinary incident reports for offenses

including multiple charges for setting a fire, multiple charges for
assault, multiple charges of refusing a drug test, multiple charges for
destroying property, multiple charges for possessing a dangerous
weapon, multiple charges of interfering with security devices,
interfering with staff, multiple charges of refusing an order, multiple
charges of threatening bodily harm, multiple charges of engaging in
sexual acts, and self-mutilating, among others.  <u>See</u> Doc. Nos. 79, 92
¶ 12.

42.  On October 23, 2001, psychology staff at USP Leavenworth noted
that Womack threatened to "hurt," "choke," and "do what I need to
do" if staff placed a cellmate in Womack's cell.  <u>See</u> Mental Health
Status (Attach. 4 to Ex. 1) (noting also "my attorneys would love to
defend that position").  <u>See</u> <u>id.</u> ¶ 13.

43.  Psychology staff noted Womack was "loud and aggressive in his
comments" but "there is no evidence that Womack suffers from a
serious mental health condition that would impair his ability to make
rational. . . decisions."  <u>See</u> <u>id.</u> ¶ 14.

44.  Staff also noted that Womack "is deemed to be responsible for his
actions[, and] he is not compelled to act in this manner for mental
health reasons, nor is he incapable of conforming his actions to the

rules . . . of the Bureau of Prisons. Should he attack another inmate or staff in the time period proximate to this evaluation, he should be accountable for his actions, and considered to have premeditated his actions." See id. ¶ 15.

45.    On February 13, 2002, psychology services staff interviewed Womack after he verbally threatened to kill himself. See id. ¶ 16.

46.    At this time, psychology staff noted that Womack "reported a history of self mutilation and suicide attempts." See id. ¶ 17.

47.    Psychology staff also noted, "most recently Womack began smearing and throwing feces on the range in Special Housing Unit ("SHU") after a range wide confiscation of excess property. See id. ¶ 18.

48.    Womack had covered his cell window and threatened to hurt himself if his property was not returned. See id. ¶ 19.

49.    Womack stated, "he needed to be strapped down," and "elaborated that he would sue if we did not follow policy on this matter." See id. ¶ 20.

50.    Womack also stated, "that he would hit his head against the wall until he went into a coma." See id. ¶ 21.

51.    On June 5, 2002, staff placed Womack in 4 point restraints. See id. ¶ 22.

52.  When seen by psychology staff, Womack refused to respond and attempted to spit on the staff member.  See id. ¶ 23.

53.  Staff noted that Womack had attempted to "manipulate staff into changing his life/housing status."  See id. ¶ 24.

54.  On January 31, 2003, psychology staff interviewed Womack after he made a suicidal gesture by attempting to hang himself.  See id. ¶ 25.

55.  Specifically, Womack tied strips of towel to his cell bars and when staff were present, he tried to hang himself.  See id. ¶ 26.

56.  Psychology staff noted there is "little evidence that this inmate attempted to end his life."  See id. ¶ 27.

57.  Psychology staff further noted the suicide gesture appeared to be "manipulative . . . designed to either change his environment or to elicit as staff response."  See id. ¶ 28.

58.  Psychology staff noted again that there is no indication that Womack suffered from a serious or significant mental health disorder.  See id. ¶ 29.

59.  Psychology staff noted that Womack "frequently complains about the conduct of others and minimizes the extent and breadth of his own level of acting out."  See id. ¶ 30.

60.  On February 4, 2003, the BOP transferred Womack from USP

Leavenworth to the United States Medical Center of Federal

Prisoners ("USMCFP") in Springfield, Missouri, for a mental health

evaluation because of his continuous disruptive behavior.  See id. ¶

31.

61.    USMCFP staff noted Womack was "demanding and required an

inordinate amount of attention."  See id. ¶ 32.

62.    USMCFP mental health staff concluded that "although inmate

Womack has a personality disorder, this disorder would not improve

with inpatient mental health treatment."  See id. ¶ 33.

63.    USMCFP mental health staff further noted that Womack "will likely

continue to benefit from clear behavioral expectations and clear

consequences for inappropriate behaviors."  See id. ¶ 34.

64.    In addition, staff noted that Womack engages in self destructive

behavior when he feels wronged by the system.  Mr. Womack will be

a management problem wherever he is housed."  See id. ¶ 35.

65.    BOP transferred Womack from USMCFP Springfield back to USP

Leavenworth on March 21, 2003.  See id. ¶ 36.

66.    Upon Womack's return to USP Leavenworth, after began banging his

head against the wall in the Receiving and Discharge ("R&D") area

of the institution, Womack threaten to kill himself.  See id. ¶ 37.

67.  Once again, psychology staff interviewed Womack who stated that "his will" would not "be broken by having him sent back to USP Leavenworth."  See id. ¶ 38.

68.  On June 12, 2003, staff placed Womack in 4 point restraints at USP Leavenworth after he became assaultive towards staff.  See id. ¶ 39.

69.  Staff noted that "during efforts to allow him to come out of the 4 point restraints, Womack demonstrated self injurious gestures by tying nooses out of his bed sheets and trying to hang himself."  See id. ¶ 40.

70.  BOP sent Womack back to USMCFP Springfield on June 24, 2003. See id. ¶ 41.

71.  Once again, USMCFP staff concluded that Womack had a personality disorder which was not likely to improve with inpatient mental health treatment, and that "Mr. Womack will be a management problem wherever he is housed."  See id. ¶ 42.

72.  On August 7, 2003, the BOP designated Womack to USP Lewisburg. See id. ¶ 43.

73.  Womack maintained clear conduct for several months after his arrival at USP Lewisburg.  See id. ¶ 44.

74.  USP Lewisburg psychology staff saw Womack for the first time on

August 8, 2003; and staff noted that Womack was "optimistic" and wanted to "maintain control over himself and his environment."  <u>See</u> <u>id.</u> ¶ 45.

75.   On February 11, 2004, after staff received reports that Womack had stolen from other inmates, staff placed Womack in USP Lewisburg's SHU.  <u>See</u> <u>id.</u> ¶ 46.

76.   After staff moved Womack to the SHU, Womack stepped through his hand restraints and removed a piece of metal conduit from the wall and began cutting his wrist.  <u>See</u> <u>id.</u> ¶ 47.

77.   BOP staff entered the cell and placed Womack in soft four point restraints.  <u>See</u> <u>id.</u> ¶ 48.

78.   As staff exited the cell, Womack began cutting his face on a metal portion of the restraints on his hands.  <u>See</u> <u>id.</u> ¶ 49.

79.   Staff re-entered the cell and upgraded the restraints to hard four point restraints.  <u>See</u> <u>id.</u> ¶ 50.

80.   Womack then tried to reopen his wrist wound by applying pressure to it with metal portion of the wrist restraint.  <u>See</u> <u>id.</u> ¶ 51.

81.   Authorization was received to place Womack on suicide watch as staff moved him to the suicide watch cell in the hospital where he remained in 4 point hard restraints.  <u>See</u> <u>id.</u> ¶ 52.

82.  Womack received incident reports for destroying government property and self-mutilating.  See id. ¶ 53.

83.  Carl Middleton, Ph.D., an institution psychologist, saw Womack on December 12, 2003; at which time, staff noted Womack's history of making "suicidal gestures and threaten[ing] himself primarily as a way of manipulating staff to favorably modify the conditions of his incarceration."  See id. ¶ 54.

84.  During his interview with Dr. Middleton, Womack said "You know my record" and threatened "hunger strikes, suicide attempts, refusal to cuff up, restraints, and so forth."  See id. ¶ 55.

85.  Dr. Middleton recommended that "standard correctional procedures will likely prove effective in managing his behavior."  See id. ¶ 56.

86.  On February 11, 2004, Dr. Middleton saw Womack again on February 11, 2004.  See id. ¶ 57.

87.  At this time, Womack again threatened to harm himself "by cutting, banging his head, or biting himself.  See id. ¶ 58.

88.  Dr. Middleton placed Womack on suicide watch.  See id. ¶ 59.

89.  On February 13, 2004, Dr. Middleton saw Womack and  noted that "while on suicide watch, Womack asked to remain in ambulatory restraints [because] "such restraints help him avoid acting on

impulses to harm himself." <u>See</u> <u>id.</u> ¶ 60.

90.   Dr. Middleton counseled Womack on better ways to manage his behavior, but "Womack refused and threatened to continue self aggression if the restraints were removed." <u>See</u> <u>id.</u> ¶ 61.

91.   On February 14, 2004, after staff found that Womack had contraband in his SHU cell and staff confiscated the items, Womack threw his lunch at SHU staff as they exited the door, then cut his wrists on his ambulatory restraints and threatened staff. <u>See</u> <u>id.</u> ¶ 62.

92.   Staff moved Womack to a cell in the health services area and placed him back in hard restraints – Womack again began cutting his facing using the restraints. <u>See</u> <u>id.</u> ¶ 63.

93.   As a result of his conduct, Womack received incident reports for threatening and self-mutilating. <u>See</u> <u>id.</u> ¶ 64.

94.   On March 3, 2004, Womack received a disciplinary incident report for fighting with another inmate in the gymnasium bathroom. <u>See</u> <u>id.</u> ¶ 65.

95.   While attempting to evaluate Womack after the fight, Womack used a tissue to wipe blood off his head and ear and then he ate the tissue. <u>See</u> <u>id.</u> ¶ 66.

96.   On March 4, 2004, Womack received an incident report for

interfering with security devices, being unsanitary, and self mutilation, after an officer observed him covering a camera in his cell, defecate on the cell floor and attempt to hang himself with his jumpsuit.  See id. ¶ 67.

97.  That same day, Dr. Middleton saw Womack and Womack stated: "I'm going to cut up and do what I have to do until you get me out of here."  See id. ¶ 68.

98.  After being returned to his cell, Womack defecated on the floor and fashioned a "shoddy noose."  See id. ¶ 69.

99.  After SHU staff entered the cell and placed Womack in 4 point restraints, Dr. Middleton attempted to speak with Womack but he refused to speak or acknowledge him.  See id. ¶ 70.

100.  On March 9, 2004, Chief Psychologist Lawrence Karpen, Ph.D. saw Womack and recommended that Womack "remain in restraints until he contracts against self harm as it appears likely he will carry out his threat to harm himself if the restraints are removed prior to doing so." See id. ¶ 71.

101.  On March 10, 2004, Womack, who was already in SHU in ambulatory restraints, covered his window and threatened to harm himself.  See id. ¶ 72.

102.    SHU staff observed Womack through the food slot, saw him trying to cut his face on the cell wall, and after they opened the cell door, Womack tried to spit in staff's face.  See id.  ¶ 73.

103.    A team was assembled to go into the cell and place Womack in more secure restraints to prevent him from hurting himself or staff.  See id. ¶ 74.

104.    While placing Womack into restraints, SHU staff observed a white plastic spoon in his mouth that he was attempting to swallow.  A health service staff member had to retrieve a 2.5 inch plastic spoon handle from Womack's mouth using forceps.  Health services staff examined Womack and noted he had no injuries.  See id. ¶ 75.

105.    On April 6, 2004, Dr. Karpen saw Womack, noting that Womack's "mood was irritable . . . complaining about perceived mistreatments. . . . Issues are clearly characterological. . . . Respond with sound correctional interventions to include restraints as indicated."  See id. ¶ 76.

106.    On April 18, 2004, Womack assaulted SHU staff by throwing a food tray which hit a BOP staff member in the groin.  See id. ¶ 77.

107.    On April 22, 2004, Dr. Middleton attempted to interview Womack but he would not speak with him.  See id. ¶ 79.

108. Dr. Middleton noted that Womack frequently utilizes "mutism" as part of his misbehavior and he "takes pride in past accomplishments[,] noting that he has endured covering himself with feces, refusing to surrender restraints, refusing food, making suicidal gestures." See id. ¶ 80.

109. Again that day, Dr. Middleton saw Womack because he made "light scratches on his forearm by rubbing them against a piece of metal in the cell and placed a piece of fabric around his neck as if attempting to hang himself." See id. ¶ 81.

110. Womack again refused to speak to Dr. Middleton, which was "not unusual when he is resisting authorities." See id. ¶ 82.

111. On April 28, 2004, because Womack refused to give a small sharpened object to SHU staff and continued to make slashing movements over his wrist, SHU staff used chemical agents to attempt to gain compliance. See id. ¶ 83.

112. After Womack finally complied, staff placed Womack in restraints. See id. ¶ 84.

113. That same day, Dr. Middleton saw Womack, and noted that staff will likely have to place Womack in restraints again. See id. ¶ 85.

114. On May 4, 2004, Dr. Karpen noted Womack remained in restraints

and that Womack stated, "I'd rather die than let anyone think they got the best of me."  See id. ¶ 86.

115.    On June 8, 2004, Womack displayed a handful of pills to SHU staff and swallowed them.  See id. ¶ 87.

116.    Staff took Womack to health services where he refused treatment and spit on a staff member.  See id. ¶ 88.

117.    Womack was then taken via ambulance to a local hospital; and in the ambulance, Womack became aggressive and ambulance staff had to sedate him to prevent him from harming himself or others before reaching the hospital.  See id. ¶ 89.

118.    Womack was hospitalized until June 11, 2004.  See id. ¶ 90.

119.    On July 21, 2004, after Womack threatened to destroy his cell, kill staff, and then lunged at an officer, Womack was placed in 4 point hard restraints. See id. ¶ 91.

120.    On August 25, 2004, Womack told psychology staff that he was "laying down" because he expects to be released in the near future. See id. ¶ 92.

121.    On December 8, 2004, at approximately 8:30 pm, health services staff was called to SHU when Womack was found lying in his cell.  See id. ¶ 93.

122.  Staff moved Womack to the health services area, where Womack
      reported that he fell while cleaning water in his cell and hit his head
      on the toilet.  See id. ¶ 94.

123.  Medical staff found Womack to have some localized swelling in the
      left occipital area and noted he had low blood sugar; and they treated
      him accordingly  See id. ¶ 95.

124.  Health services staff rechecked Womack in his SHU cell at 11:30
      p.m. and 1:30 p.m. the following day.  See id. ¶ 96.

125.  Gabrielson noted that the spilled water from the previous day was
      gone.  See ¶ 97.

126.  On December 9, 2004, at approximately 2:00 p.m., while Gabrielson
      placed Womack back in the SHU cell and attempting to remove his
      hand restraints (which are required when an inmate in segregation is
      out of his cell), Womack pulled away by placing both feet on the door
      and lunged backwards.  See id. ¶ 98.

127.  The cell jammed and Womack pulled Gabrielson's arm through the
      food slot (as a result of the pressure Womack was applying to the
      inside of the door).  See id. ¶ 99.

128.  Gabrielson maintained control of the hand restraints as the door was
      reopened.  See id. ¶ 100.

129.    Gabrielson reapplied the leg restraints and martin chain that had been

removed prior to placing Womack in the cell and escorted Womack

out of that cell to another.  See id. ¶ 102.

130.    Defendant Smith authorized Womack to be kept in ambulatory

restraints.  See id. ¶ 104.

131.    After staff placed the restraints on Womack, he refused a medical

evaluation.  Lt./Med. Staff Review (Attach. 32 to Ex. 1).

132.    On December 11, 2004, Womack refused to acknowledge or speak to

staff.  See id. ¶ 110.

133.    On December 12, 2004 and December 13, 2004, Womack continued

to refuse to acknowledge or speak to staff; attempted to cover himself

with a blanket and not allow staff to check his restraints.  See id. ¶

111.

134.    On December 14, 2004, Womack flushed his boxer shorts down the

toilet.  See id.

135.    On December 16, 2004, Womack appeared agitated and mumbling;

refused to allow staff to inspect his restraints; called SHU staff

"bitches;" stated he would "wear these (restraints) til April;" and

scattered the remains of his lunch on the floor of the cell.  See id. ¶

117.

136.    After staff cleaned and searched Womack's cell, Womack stated,

"that staff were fucked up for not putting him in restraints earlier."

See id. ¶ 118.

137.    On December 17, 2004, Womack continued to refuse to acknowledge

or speak to SHU staff; continued to refuse several SHU staff orders to

remove his blankets from covering his restraints so they could be

inspected; spread most of his food on the door and floor; and told

SHU staff "fuck you, I ain't taking no cellmate, take me out (of

restraints) and you'll be sorry." See id. ¶ 119.

138.    On December 18, 2004 and December 19, 2004, Womack continued

to refuse to acknowledge or speak to staff and he was medically

evaluated. See id. ¶ 120.

139.    On December 20, 2004, after Womack broke his left hand restraint, a

use of force team removed the broken restraints and put two sets of

wrist restraints on  Womack because he had demonstrated his ability

to break one. See ¶ 121.

140.    On December 21, 2004, Womack stated the situation would "get

worse before it gets better" and "he will stay in restraints, go fuck

yourself." "[Y]ou tell the warden he is a bitch and I'm going to stay

in restraints until I get a radio or you all four point me." See id.

141. Dr. Hunter determined that Womack was not suffering from a major mental illness, but rather a severe character disorder.  See id. ¶ 125.

142. Dr. Hunter noted Womack "made clear his intention to remain disruptive" in an attempt to exert control over his environment and "his actions appear very purposeful and calculated."  See id. ¶ 126.

143. On December 22, 2004, Womack complained about the circulation in his wrists and was checked by medical staff.  See ¶ 127.

144. Womack continued to tell staff "fuck you."  See id. ¶ 128.

145. On December 23, 2004, Womack continued to refuse to acknowledge or speak to staff, or to uncover his restraints so that staff could inspect them; manipulated his restraints requiring the use of force team to remove and reapply the restraints; "urinated and defecated in the cell and smeared feces on the cell bars and walls." See id. ¶ 129.

146. On December 24, 2004, Womack rubbed feces and peanut butter rubbed on his cell wall; refused orders to clean his cell.  See id. ¶ 130.

147. During their periodic evaluation, medical staff noted Womack's cuffs were tight, so staff loosened the hand restraints.  See id. ¶ 131.

148. On December 25, 2004 and December 26, 2004, the walls were still smeared with feces in his cell. See id. ¶ 132.

149. Staff again loosened Womack's restraints and medical staff cleaned

and bandaged Womack's writs and noted "mild swelling" in his

wrists.  See id. ¶ 133.

150.    On December 27, 2004, Womack continued to refuse to speak to

SHU staff; continued to spread feces in his cell; "stop knocking on

my door and leave me the fuck alone;" refused to clean his cell; and

told SHU staff that the only way he would leave was in a "body bag."

See id. ¶ 134.

151.    On December 28, 2004, Womack continued to refuse to speak to

SHU staff; continued to spread feces in his cell; requested clean boxer

shorts and that the bandages on his wrists be changed; urinated near

Defendant Gabrielson.  See id. ¶ 135.

152.    That day, Womack refused staff's offer to take him out of restraints

so that he could clean his cell.  See id. ¶ 136.

153.    Medical staff cleaned Womack's wrist abrasions and noted that

Womack was sitting on the bed smiling, but refused to speak.   See id.

154.    Later that same day, staff removed Womack from his cell and "power

washed" it.  See id. ¶ 138.

155.    Upon being returned to his cell, SHU staff noted that Womack

"urinated and defecated on the floor" and began to "pick paint off the

walls." See id. ¶ 139.

156.   On December 29, 2004, SHU staff documented that Womack appeared "agitated;" continued to spread feces throughout his cell; and continued to pick paint off the walls.  See id. ¶ 140.

157.   On December 30, 2004, SHU staff noted Womack "preaching" at his door and making demands "for a radio, new headphones, a holiday package and some porn magazines;" stating "I will wear these chains for fifty days before I go back to a regular cell without a radio;" and declaring he was "wearing these chains for the people of Africa."  See id. ¶ 141.

158.   Womack was taken out of the cell while the cell was again cleaned. See id. ¶ 142.

159.   On December 31, 2004, Medical staff tried to check wounds on his wrists and his restraints but Womack refused.  See id. ¶ 143.

160.   That day Womack told staff to "eat shit; "If I get a chance you're getting a face full of shit; "You punk asses think you can break me but I'm not going to break, you'll see."  See id. ¶ 144.

161.   On January 1, 2004, Womack stated, he was "going to put feces back on his walls so that staff would have to clean it."  See id. ¶ 145.

162.   That same day, medical Staff cleaned Womack's wrists abrasions. See id. ¶ 146.

163. On January 2, 2004, Womack continued to refuse to speak to SHU staff; and medical staff noted Womack's wrists were healing and he had no signs of infection.  See id. ¶ 147.

164. On January 3, 2004, medical staff evaluated Womack and noted that the only injuries were minor abrasions on Womack's left ankle and "partial thickness abrasions - bilateral posterior wrists from prior manipulation of wrist restraints."   No infection was noted and no medical attention was required.  See id. ¶ 149.

165. On January 3, 2005, Smith ordered that Womack's  restraints be removed.  See id. ¶ 150.

**ADDITIONAL FACTS IN DISCOVERY: Ambulatory Restraints**

166. Womack, like other inmates, was transported to different institutions in ambulatory restraints by bus and plane. ("If you mean ambulatories like I am now, with a belly chain, feet shackles, handcuffed, black box, only time I was in D.C. was when I was being transferred outside the institution").  See Womack Dep. (Ex. B) at 153 ¶ 9 to 159 ¶ 25, at 161 ¶¶ 13-17.

167. These trips could be only one hour or could last days.  See id.

## ADDITIONAL FACTS SHOWING WOMACK HAS NO CONSTITUTIONAL INJURIES

168.    Womack testified that during the time he was restrained between December 9, 2004, and January 3, 2005, he had holes in his wrists that were bleeding, "[a]nd you could see the white, the inside of my body." See id. at 58 ¶ 24 to 60 ¶ 6.

169.    Womack testified that his wrists were constantly bleeding, but he did not have blood dripping down his hands and he was not bleeding so that blood was accumulating on the floor. See id. at 62 ¶¶ 4-11 ("Nah. I had blood around my wrists."), at 63 ¶ 3 to 64 ¶ 6.

170.    In additional to the two hour checks, the medical record between December 9, 2004, and December 20, 2004, demonstrates that Womack voiced no complaints about wrist cuts or neck or back pain to medical staff. See Medical Record (Ex. V) at 00117-00123.

171.    As noted above, on December 20, 2004, a use of force team was called to Womack's cell because he broke his hand restraints. See Video of December 20, 2004 (hand-delivered to Court and previously provided to Womack's counsel) at 7:47 p.m.

172.    At 7:55 p.m. on the video, Womack's writs are visible, and show no signs of any open wounds or pink or white meat. See id.

173.  Rather, Womack complains at 8:01 p.m. and 8:08 p.m. about the newly added second set of handcuffs and wrists shackles are bothering him, and correction staff rectify this problem.  See id.

174.  At 8:20 p.m., on the video, Womack threatens to cut his wrists open if he is not strapped down.  See id.

175.  At 8:47 p.m., Womack threatens to commit suicide.  See id.

176.  Medical Staff check an inmate in restraints a minimum of twice an eight hour shift to check distal circulation and  to determine if there were is an swelling caused by the restraints.  See Deposition of Mark Joseph Peoria (Ex. W) at 45 ¶ 16 to 50 ¶ 4.

177.  When checking restraints, medical staff ask questions of the inmates, such as "are you eating?  Are you using the bathroom?  Do you have any complaints?  Are there any injuries."  See id. at 86 ¶ 21 to 87 ¶ 10.

178.  Medical staff found Womack "was pretty much uncooperative with everyone."  See id. at 94 ¶¶ 1-9.

179.  When PA Peoria went to examine Womack "he was generally uncooperative, verbally abusive, threatening."  See id. at 94 ¶¶ 10-14.

180.  PA Peoria testified that on December 15, 2005, Womack was "far more verbally abusive and threatening."  See id. at 96 ¶¶ 12-20.

181. PA Peoria testified that on December 28, 2005, Womack had "a few little scratches here and there."  See id. at 105 ¶¶ 1-4.

182. PA Peoria testified that he only sees these types of scratches when an inmate attempts to manipulate their restraints.  See id. at 105 ¶¶ 5-13.

183. PA Peoria treated these scratches by placing a three-inch cotton elastic roller gauze over the scratches.  See id. at 106 ¶ 19 to 107 ¶ 2.

184. Defendant Dodrill testified:

Q   So can an inmate be placed in restraints
for an indefinite amount of time without facing a
    substantial risk of harm?
 A   That's why we have medical people check on
them regularly.  We rely on them to tell us if
there's any harm come to the inmate.  I've never
heard of any.  Certainly, Womack had the chance to
complain to the PA or lieutenant.  To my knowledge,
there was never any complaint made by him.
 Q   But is an inmate placed at a substantial
risk of harm the longer he's placed in restraints?
 A   I don't think so, but you might find
somebody else who thinks differently.  I have no
knowledge of that occurring.


Deposition of D. Scott Dodrill (Ex. X) at 191 ¶¶ 6-19.

185. Dodrill also testified:

Q Can placing an inmate in restraints harm
that inmate?
 A   I'm not aware of how that would happen.
They could harm themselves with restraints by
twisting their wrists in the chains and everything.

> But as far as being in restraints and the way
> they're -- they still have the availability,
> especially in ambulatory, to move around and twist
> everything.  It's not like it's four-point
> restraints.

Id. at 190 ¶¶ 7-16.

186.  During the time period December 2004 to January 2005, Lawrence

Karpen, Ph.D., the Chief Psyshologist at USP Lewisburg  supervised

staff psychologist Jennifer Hunter, Psy.D., and drug abuse program

coordinator Carl Middleton, Ph.D.  See Declaration of Lawrence

Karpen, Ph.D (Ex. Y) ¶¶ 1-3.

187.  As part of his duties, Dr. Karpen did rounds in the Special Housing

Unit ("SHU"), which included being available for any inmate who

required care and providing thirty-day assessments of all inmates

currently in the SHU.  See id. ¶ 4.

188.  During this time period, when an inmate was in ambulatory restraints,

a member of the mental health staff would check on the inmate

frequently and informally consult with correctional staff.  See id. ¶ 5.

189.  Dr. Karpen or a member of the mental health staff conducted monthly

SHU reviews for inmate David Lee Womack beginning in March

2004, and the staff was called to conduct frequent suicidal risk

assessments based on inmate Womack's behavior.  <u>See</u> <u>id.</u> ¶ 6.

190.    On March 9, 2004, Dr. Karpen found inmate Womack to be fully alert, oriented, and verbal – he was in complete behavioral control and goal oriented – that goal was to be transferred out of the USP Lewisburg.  <u>See</u> <u>id.</u> ¶ 7.

191.    Dr. Karpen came to understand that a disciplinary hearing officer recommended inmate Womack to be transferred in April 2004 based on inmate Womack's inappropriate behavior at USP Lewisburg.  <u>See</u> <u>id.</u>

192.    During his time at USP Lewisburg, inmate Womack engaged in self-abusive behavior and made numerous suicidal gestures, but Dr. Karpen did not believe that Womack was attempting to actually kill himself during his purported suicide attempts.  <u>See</u> <u>id.</u> ¶ 8.

193.    During times when inmate Womack made suicide gestures, Dr. Karpen recommended that he be placed or remain in restraints to prevent further self-abusive behavior.  <u>See</u> <u>id.</u>

194.    On December 9, 2004, Dr. Karpen was informed by correctional staff that inmate Womack was placed in ambulatory restraints because of a physical altercation with Lieutenant Kenneth Gabrielson.  <u>See</u> <u>id.</u> ¶ 10.

195.  When Dr. Karpen interviewed inmate Womack on December 9, 2004, inmate Womack stated that he was going "throw so much shit and piss that they're going to beg to get me out of here." See id. ¶ 11.

196.  During the time inmate Womack was in restraints, Warden Joseph Smith asked Dr. Karpen to monitor inmate Womack while Dr. Karpen made rounds in the SHU and asked that Dr. Karpen talk to Womack to convince him to manage his behavior so that he could be released from restraints.  See id. ¶ 12.

197.  Dr. Karpen reported to Warden Smith frequently, if not on a daily basis, of his interactions with inmate Womack and provided Smith with his opinion as to Womack's behavior while Womack was in restraints, including discussions about what correctional staff encountered during their interactions with inmate Womack while Womack was in restraints.  See id. ¶ 13.

198.  Dr. Karpen reported specifically that inmate Womack's actions were goal oriented and he was attempting to manipulate his situation, namely to achieve a transfer out of the institution.  See id. ¶ 14.

199.  During Dr. Karpen's review of inmate Womack in restraints, Dr. Karpen did not believe Womack was uncomfortable in his restraints, but rather, Womack appeared quite proud of how comfortable he was

with the restraints.  See id. ¶ 15.

200. It was also Dr. Karpen's opinion that the restraints did not cause inmate Womack any mental or emotional injuries.  See id. ¶ 15.

201. Dr. Karpen reported to Warden Smith that it was his opinion that the restraints were not the cause of inmate Womack's actions that included spreading feces in his cell, threatening staff, and refusing orders.  See id. ¶ 16.

202. Dr. Karpen reported to Warden Smith that it was his opinion that inmate Womack was misbehaving in effort to demonstrate he could control his own situation.  See id. ¶ 17.

203. Dr. Karpen reported to Warden Smith, that based on inmate Womack's previous history and his ongoing actions, staff should maintain Womack in restraints, as he may engage in self-injurious behavior or he may attempt to injury staff in an effort to achieve his desired goals of manipulating his situation.  See id. ¶ 18.

204. Dr. Karpen  agreed with Dr. Hunter's assessment of December 21, 2004, that Womack's actions were intended to maintain control over his situation and were very purposeful and calculated.  See id. ¶ 19.

205. Dr. Karpen also agreed that inmate Womack should remain in restraints and to be treated as a behavioral management case.  See id.

206. As inmate Womack spent more time in restraints, his goals morphed into not just wanting to manipulate the system, but to also to remain in restraints as a reflection of his being in control of his environment. See id. ¶ 20.

207. After January 1, 2005, Dr. Karpen's discussions with Warden Smith and correctional staff included setting lower goals for inmate Womack to allow him to come out of restraints.  See id. ¶ 21.

208. Although inmate Womack was still a behavioral management case, his restraints were now being used as prop to facilitate that misbehavior.  See id.

209. Dr. Hunter testified that Womack "seemed very content to again, to show that he was stronger than we were and he would outlast us." See Deposition Jennifer Lynn Hunter (Ex. Z) at 103 ¶¶ 17-21.

210. Dr. Hunter also testified that Womack did not appear uncomfortable in his restraints, but rather he did not mind the restraints at all.  See id. at 103 ¶ 19 to 104 ¶ 8.

211. Womack admitted that he refused orders of staff and refused to speak with them while he was in restraints.  See Womack Dep. (Ex. B) at 320 ¶¶ 12-23.

## WHAT GABRIELSON KNEW AND WHY HE ACTED

212.   Defendant Gabrielson knew Womack previously as an orderly who worked on the compound for him, and Gabrielson had a good rapport with him.  See Deposition of Kenneth Gabrielson (Ex. AA) at 160 ¶¶ 10-21.

213.   Gabrielson testified that Womack was "high maintenance. Very zero to a hundred in a hurry."  See id.; see also id. at 188 ¶ 10-16 ("Like I said, he goes from zero to a hundred in a hurry.").

214.   Gabrielson knew of Womack's disciplinary history, as evidenced by the December 9, 2004 use of force video ((hand-delivered to Court and previously provided to Womack's counsel).

215.   Gabrielson would spend hours of his day with inmate Womack while he was in restraints, trying to convince him to cooperate so that he could be released from the restraints; Gabrielson would also routinely check Womack's restraints to make sure they were not too tight, etc. See Gabrielson Dep. (Ex. AA) at 182 ¶¶ 16-22, at 212 ¶ 5 to 213 ¶ 4, at 200.

216.   Gabrielson believed that Womack wanted instant gratification, Womack wanted to get a following on the inmate range, he was refusing a cell mate to gain attention because he wanted a transfer.

See id. at 190 ¶ 13 to 197 ¶ 20.

217.  Gabrielson testified "it was more important to [Womack] to get that
      attention, the warden's attention that he was demanding a transfer,
      and we speed it up." Id. at 197 ¶¶ 11-20.

218.  While in restraints, Womack flushed his clothing down the toilet, and
      tear his boxer shorts off, smear them with feces, and push them
      through the food slot where staff had to feed Womack. See id. at 204
      ¶ 1 to 205 ¶ 19.

219.  Also during this time, Womack was "trying to throw urine and feces
      out at staff" and threatening to throw it. See id. at 232 ¶ 3 to 234 ¶ 1
      ("he's start throwing stuff out at the outer doors and it was to the
      point where, like I said, we had to buy a power washer to clean up
      just to be able to see into the cell and not have to touch his urine and
      feces to feed the individual.").

220.  Gabrielson stated: "It was nonstop for the entire time that he was in
      restraints." See id. at 205 ¶¶ 20-21.

221.  Gabrielson also had Dr. Larry Karpen and Dr. Jennifer Hunter from
      the psychology staff meet with Womack during the time he was in
      restraints. See id. at 208 ¶ 7 to 209 ¶ 20.

222.   Gabrielson and Karpen were trying to have Womack reach goals, like

accept a cellmate or to go into a cell with a cell mate, but Womack
continued his misbehavior to try to be transferred.  See id. at 197 ¶¶
11-20, at 209 ¶ 12 to 210 ¶ 20, at 222 ¶ 11 to 225 ¶ 16, 230 ¶ 9 to 233
¶ 22).

223.  Gabrielson's main goal was to have Womack function like all the
other inmates in the SHU.  See id. at 225 ¶¶ 14-16.

224.  Gabrielson did not continually write Womack up for disciplinary
infractions because they had no effect on his behavior.  Indeed, the
incident report he gave Womack was thrown back at staff with feces
covering the report.  See id. at 246 ¶¶ 5-17.

225.  Gabrielson testified that he continued to monitor Womack to make
sure he was "display[ing] and acceptable level or pattern of behavior
so I know I can take him out without risk of self, without risk to me,
to my staff, to the housing unit, that he can be managed, that he's not
going to continue to do what he started in the beginning." See id. at
78 ¶ 6 to 79 ¶ 8.

226.  During the time Womack was in restraints, Gabrielson was in regular
communication with the Captain, and would meet with the Warden
twice a week about Womack's restraints.  See id. at 218 ¶ 9 to 221 ¶
11.

## WHAT OLIVER KNEW AND WHY HE ACTED

227.  Defendant Captain John Oliver knew that Womack was placed in restraints after he had a physical altercation with a staff member.  See Deposition of John Oliver (Ex. BB) at 121 ¶ 4 to 122 ¶ 21.

228.  Oliver was aware that prior to December 9, 2004, Womack had previous incident reports and had been previously in restraints.  See id. at 206 ¶ 21 to 207 ¶ 13.

229.  Oliver testified that while Womack was in restraints he was disruptive, verbally aggressive, spitting, and non-compliant with staff instructions.  See id. at 107 ¶¶ 6-11.

230.  Oliver attempted conversations with Womack to try to get Womack out of the restraints.  See Gabrielson Dep. (Ex. AA) at 228 ¶¶ 2-19

231.  When he was at the institution Oliver did daily rounds, and was in communication with staff about Womack's time in restraints.  See Oliver Dep. (Ex. BB) at 132 ¶¶ 10-18.

232.  When answering questions about periods of time when Womack was in restraints and appeared compliant, Oliver testified that you have to look at the previous behavior; and if there was previous bad behavior, you would have to see if there was a pattern developing that the restraints were having the desired calming effect.  See id. at 208 ¶ 2 to

209 ¶ 6.

233. Oliver found Womack's failure to communicate and passive aggressive behavior troubling. See id. at 142 ¶ 1 to 143 ¶ 20.

234. More so, was the fact that after periods of lack of communication, Womack would go to "full-on aggressive" and target staff. See id. at 142 ¶¶ 18-21.

## WHAT SMITH KNEW AND WHY HE ACTED

235. Smith knew that, prior to the incident at issue, Womack did not comply with the rules and regulations of the institution and had numerous incidents while in prison, including inmate and staff assaults, refusing orders, threatening to harm himself. See Deposition of Joseph V. Smith (Ex. CC) at 98 ¶¶ 4-13, at 101 ¶¶ 2-21.

236. Smith remembered Womack as a generally disruptive, high maintenance inmate who was difficult to deal with and required a "mountain of paperwork." See id.

237. On December 9, 2004, Smith was also informed that Womack was involved in a physical altercation with correctional staff. See id. at 102 ¶ 22 to 103 ¶ 3.

238. Smith decided to maintain Womack in restraints because of the information provided to him by Gabrielson, Oliver, Dr. Karpen,

medical officers, associate wardens, and other staff who observed Womack while in restraints.  See id. at 133 ¶ 17 to 135 ¶ 19.

239.  Smith met daily with staff to discuss Womack, trying to figure a way to have Womack to calm down and return to programing at the institution.  See id.

240.  Smith recognized the problem Womack was causing with the man hours and management issues required to keep Womack in restraints. See id. at 158 ¶ 21 to 159 ¶ 12.

241.  When asked why Womack was asked to take a cellmate, Smith said not only was Womack asked about taking a cell mate, but also whether he would attempt to harm himself, or continue to threatened staff.  See id. at 174 ¶ 10 to 175 ¶ 4.

## WHAT DODRILL KNEW AND WHY HE ACTED

242.  Dodrill knew of Womack's previous misconduct at USP Leavenworth when he was warden of USP Lewisburg.  See Dodrill Dep. (Ex. X) at 138 ¶ 3 to 139 ¶ 14.

243.  Dodrill was called within eight hours of Womack being placed in restraints and was told Womack had a physical altercation with a staff member.  See id. at 139 ¶ 15 to 140 ¶ 21, at 150 ¶¶ 8-12.

244.  Dodrill spoke with Warden Smith on a regular basis while Womack

was in restraints, and Warden Smith told Dodrill he spoke with Chief Psychologist Karpen and medical and other staff about trying to work through Womack's issues.  See id. at 139 ¶ 9 to 144 ¶ 7.

245.  Smith reported to Dodrill that Womack was covering himself with a blanket, refusing orders, refusing to speak to staff, threatening staff, and spreading feces.  See id. at 142 ¶¶ 12-19.

246.  Dodrill's staff also received daily phone calls from USP Lewisburg, and he relied on them to report to him if there were any issues with Womack's restraints.  See id. at 149 ¶¶ 6-19, at 162 ¶¶ 11-20.

247.  After reviewing a December 9, 2004 use of force video during his deposition, Dodrill noted that even if Womack was compliant while officers were standing over him while on camera, this would not be evidence that Womack had reached acceptable behavior, as he would have to be continued to be monitored.  See id. at 153 ¶ 12 to 154 ¶ 2.

248.  Dodrill reiterated that when an inmate, like Womack, is not interacting with staff during the time he is in restraints, especially looking at his past behavior, that inmate is not in control.  See id. at 177 ¶ 17 to 178 ¶ 6.

WHEREFORE, Defendants respectfully request that the Court grant their

motion for summary judgment.

Respectfully submitted,

PETER J. SMITH
United States Attorney


Dated: <u>September 30, 2010</u>                    <u>s/ Michael J. Butler</u>
                                                  Michael J. Butler
                                                  Assistant United States Attorney
                                                  PA 81799
                                                  Dawn L. Mayko
                                                  Paralegal Specialist
                                                  United States Attorney's Office
                                                  228 Walnut Street, 2nd Floor
                                                  P.O. Box 11754
                                                  Harrisburg, PA 17108
                                                  Tel: 717-221-4482
                                                  Fax: 717-221-2246
                                                  Michael.J.Butler@usdoj.gov

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAVID LEE WOMACK,** | : | **NO. 1:CV-06-2348** |
| **Plaintiff** | : | |
| | : | **(Conner, J.)** |
| **v.** | : | |
| | : | |
| **HARLEY LAPPIN, et al.,** | : | |
| **Defendants** | : | **Filed Electronically** |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion to be competent to serve papers.

That on September 30, 2010, she served a copy of the attached

## DEFENDANTS' STATEMENT OF MATERIAL FACTS
## IN SUPPORT FOR SUMMARY JUDGMENT

by electronic service pursuant to Local Rule 5.7 and Standing Order 05-6, ¶12.2 to the following individual(s):

Aaron B. Hewitt                          Deborah Golden
Alexis J. Gilman                         Washington Lawyers Committee
John H. Shenefield                         For Civil Rights & Urban Affairs
Maxine M. Woelfling
Thomas G. Scriven
Andrew C. Whitney
Jamie L. Ghen
Morgan, Lewis & Bockius, LLP


                                    s/Dawn L. Mayko
                                    Dawn L. Mayko
                                    Paralegal Specialist