# EXHIBIT 14

# Transcript of the Testimony of **Kenneth Andrew Gabrielson**

**Date:** April 27, 2010

**Case:** David Lee Womack v. Joseph V. Smith, et al.,

Printed On: 5/10/2010



Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

1        IN THE UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

3

4               *   *   *

5  DAVID LEE WOMACK,      : CIVIL ACTION

6        Plaintiff    :

7    vs.           :

8                 :

9  JOSEPH V. SMITH, et al.,  :

10      Defendants   : NO. 1:CV-06-2348 CCC

11

12               *   *   *

13

14    Oral deposition of KENNETH ANDREW GABRIELSON,

15  JR., taken at USP Lewisburg, Training Center 2400

16  Robert F. Miller Drive, Lewisburg, Pennsylvania

17  17837, on Tuesday, April 27, 2010, at 9:29 a.m.

18  before Nancy J. Taguinot, RPR, CCR(NJ), Registered

19  Professional Reporter and Notary Public in and for

20  the Commonwealth of Pennsylvania.

21

22              *   *   *

1    would come back.  The inmates that we were taking

2    back to Lewisburg would be transferred back to

3    Lewisburg from the airlift.

4              On Tuesday --

5        Q.    If I may interrupt you.

6        A.    Sure.

7        Q.    I think that level of detail is more

8    than sufficient.  I appreciate it.

9        A.    Sure.

10       Q.    For that answer.

11             You also mentioned that you were a SHU

12   lieutenant?

13       A.    Yes, sir.

14       Q.    What was involved with that?

15       A.    Special Housing Unit lieutenant is

16   responsible for the Special Housing Unit, for the

17   staff that work in there, to ensure that they're

18   performing their job as assigned and their post

19   order, which is a guideline of what they're doing

20   on a daily basis, and to ensure that the inmates

21   are following the rules and regulations set forth

22   in bureau policy.

1          The -- you have to make sure that --

2    for example, part of my responsibilities were cell

3    rotation, to make sure that inmate gets rotated

4    from the cell that they're in to another cell every

5    21 days, to make sure that inmates are getting fed

6    three times a day, to make sure that inmates are

7    allowed ordinarily recreation five hours per week

8    outside, to make sure that inmates are getting to

9    the law library.  Like I said, recreation, that law

10   library, that they're getting their property

11   issued.

12          Basically, that Special Housing Unit, I

13   have to have a rapport with the staff in there and

14   I have to have a good rapport with the inmates that

15   are housed in there.  When an inmate cannot behave

16   on the compound, they place them in the Special

17   Housing Unit.

18          My job as the Special Housing Unit

19   lieutenant was to ensure that things in those post

20   orders, both my post orders and the officers' post

21   orders were being followed to a T.  When an inmate

22   comes off of the compound, out of the general

1    population into the Special Housing Unit, that

2    there's a visual search conducted.  That that

3    inmate is searched, metal detected to ensure that

4    no contraband is coming into the Special Housing

5    Unit.

6            That was a big problem back when I was

7    a Special Housing Unit lieutenant.  Because we were

8    going tobacco free, a lot of inmates were trying to

9    move tobacco from the compound in the Special

10    Housing Unit lieutenant -- into the Special Housing

11    Unit, rather.  It was a hustle.  It was how they

12    made money.  So that was one example right there.

13            When an inmate came in, a good visual

14    search was done on that inmate to ensure that they

15    weren't moving any contraband, any weapons.  That

16    was a big thing, too, to ensure that no weapons

17    came into the Special Housing Unit.  That we ran

18    that unit as safely and securely as we possibly

19    could.

20    Q.    And then you also mentioned you were

21    operations lieutenant?

22    A.    Yes, sir.

1    rise to him being placed in restraints in December

2    2004?

3        A.      Yes, sir.

4        Q.      What do you recall?

5        A.      I remember Officer Klosner, who was

6    working the basement, called me to come down to the

7    basement on the radio.  Reported down to the

8    basement, asked what the problem was.  I went down

9    to -- I believe it was near the end, left-hand side

10   of the basement range.  It was near cell 008, 009,

11   right in that area.  Asked him what the problem

12   was.

13              He was escorting Inmate David Womack

14   back from medical, which was in the same building

15   that our segregation unit was in at the time.  When

16   he's bringing him back -- he went over for a

17   medical exam.  His vision was blurred.  He was

18   bringing him back.  He was refusing to remove the

19   restraints he was placed in, a modified ambulatory

20   restraint to go over to the hospital.  He had a

21   Martin chain and hand restraints on his hands and

22   his waist.

1        And Officer Klosner, who was working

2    for me as part of the segregation crew at the time,

3    said he's refusing to come out of the restraints.

4    He said he's not going to give the cuff back to me

5    if I put him back in the cell.  What he meant

6    was he -- we put him in the cell and open the slot

7    that I talked of in the door and remove the

8    restraints right there.  Inmate Womack stated, I'm

9    not giving you the restraints back.

10        At that point I started talking to him.

11    I had a very good rapport with Inmate Womack, as

12    good as anybody else, I believe, that worked there.

13    I dealt with him a lot.  He was an orderly for me

14    when I was out in the compound as an operations and

15    activities lieutenant.  He was an orderly for the

16    SIS office at the time.  I had a good rapport with

17    him.  He was definitely an inmate you needed a

18    rapport with if you were going to deal with him.

19    Because he was -- he was high maintenance.  Very --

20    zero to a hundred in a hurry.  So I had a very good

21    rapport with him.

22        I started to talk to him and told

1    him -- I said, I don't know what your issue is.

2    When I come in this morning -- the first thing I

3    would do in the mornings was make my rounds through

4    the unit.  He said about his vision was blurred, so

5    I made sure that he got an appointment and got over

6    to health services that day when they had time to

7    see him.

8         Tried to convince him that he needed to

9    give the restraints back, put him in the cell.  Got

10   to the point where he was going to do it.  He was

11   going to give me the restraints back.  So I went

12   ahead and put him in the cell, started to remove

13   the restraints.

14        At that point he changed his mind.

15   Backed away from me.  I tried to hold onto his

16   restraints with my left hand and in my right hand I

17   had the restraint key that would open the hand

18   restraints.  At that time he took his shoes off and

19   put both feet up against the door, started, like,

20   climbing the inside of the door with me supporting

21   his weight holding onto his hand restraints, and

22   was pushing back to pull away.

1    So at that point he had my left hand

2  pulled all the way through the food slot, probably

3  almost up to my shoulder, at which point I told him

4  to take his feet down off -- I didn't want him to

5  fall and hurt himself any more.  Take your feet

6  down, I'll bring you out of the cell.

7    When he saw that I was going to remove

8  him from the cell, he took his feet off the door

9  and opened the cell door, had the cell door open,

10  took control of his restraints, took him out to

11  cell 024, which was an empty cell.  We didn't house

12  people in that cell.

13    Took him down to that end cell and --

14  more like a holding cell than a cell that you would

15  house inmates in.  Put him in there a while and

16  then I had staff that were working in the basement

17  maintain control of him while I went to make

18  notifications on his disruptive behavior.  I mean,

19  to report the -- you know, that he had assaulted me

20  by pulling me through the food slot into the cell

21  that he was assigned.  I believe it was 008, 009,

22  somewhere in that area.

1       From there I got authorization from

2   Warden Smith, I believe it was at the time.   I

3   notified Captain Oliver and then he called me back

4   and told me I had authorization to go ahead and

5   assemble a use-of-force team to apply ambulatory

6   restraints on Inmate Womack.

7       Q.    You had mentioned that the type of

8   restraints that were initially on Mr. Womack were

9   modified?

10      A.    I don't believe he was wearing leg

11  irons for the escort over to the -- full ambulatory

12  restraints included leg irons, is how I see it,

13  when I use ambulatory restraints.  In this case he

14  was just ambulatory restraints up front so that

15  they could do the medical exam.  You can't put a

16  blood pressure cuff on if you're cuffed behind your

17  back.

18          So the precautionary measures that were

19  taken for this escort, ordinarily from the Special

20  Housing Unit when somebody's going to get a medical

21  exam, would be to put them in a Martin chain and

22  hand restraints applied -- the hand restraints are

1    Q.    So you mentioned it was both calculated

2    and immediate.   Started immediate --

3    A.    Started immediate.

4    Q.    -- and then became calculated?

5    A.    Once I had authorization to continue

6    the restraints, then it became calculated.   To the

7    point where the video camera was in operation,

8    staff donned protective gear and medical staff came

9    down and we went right down the letter of the law

10   as far as what you do in a calculated use of force.

11        The medical staff, I'm sure, removed

12   his clothing, took his -- you know, checked his

13   vitals to make sure that everything was all right

14   medically.   And then new clothing was applied and a

15   full set of ambulatory restraints, to include

16   probably a black box was placed on that inmate

17   to -- with leg irons, Martin chain, hand

18   restraints, padlock, and the black box.

19   Q.    Now, when the use of force became

20   calculated -- let me back up.  Is it normal to use

21   confrontation avoidance when the use of force is

22   calculated?

1    leverage that it would take to pop that pin, and it

2    seemed to work successfully to keep him from

3    destroying the restraints.

4         Q.    And what about placing him in

5    four-point restraints, was that an option?

6              MR. BUTLER:  Objection to form.

7              THE WITNESS:  Four points are an option

8         and they -- it's a -- I want to say a final

9         option, but it's near the end.  It's one of the

10        last things we choose to do.  He's usually

11        hurting himself or attempting -- continually

12        attempting to hurt others before we'd place him

13        in a four-point restraint.

14   BY MR. HEWITT:

15        Q.    If he had a history of defeating

16   ambulatory restraints and you wanted to make sure

17   that he was secured in restraints, why wouldn't you

18   put him in four-point restraints?

19        A.    Because at the time he's not hurting

20   himself, he is complete -- at the time in question,

21   is that what you're asking me?

22        Q.    Yes.

1      A.      He was assaultive towards me by pulling

2   me through the cell door for one.  He didn't want

3   to give the restraints back.  When left in the

4   ambulatory restraints, at that point he wasn't

5   trying to assault anybody else.  He was making his

6   point that he wanted to keep the ambulatory

7   restraints on and at no point would he let anybody

8   take those ambulatory restraints off without

9   attempting to resist.

10          When placed into a cell in ambulatory

11  restraints, wasn't being resistant towards

12  anything.  So there was no reason to put him any

13  further -- in any greater restraint.  And that's

14  what four-point restraint would be, would be a --

15  you know, going up the ladder, adding more

16  restraints, more restrictive restraints.  And like

17  I said before, you would do that if you were trying

18  to harm somebody, if he was showing a pattern of

19  doing that.  And at the point ambulatory restraints

20  were almost enough to keep him under control.

21          It was almost what he wanted.  He

22  wanted to left in ambulatory restraints to let the

1    these restraints?

2         Q.    How long could he stay in the

3    restraints?

4              MR. BUTLER:  Objection to form.

5              THE WITNESS:  I want to say that he

6    stayed in the restraints for 25 or 26 days, but

7    at the time that we took the restraints off I

8    don't think he was pleased about it, but we had

9    an agreement that he wasn't going to be

10   assaultive when we attempted to take the

11   restraints off on the day that they were going

12   to be remove.

13        I know I spent hours that morning with

14   him in the company of psychology, religious

15   services.  I had a chaplain come down and talk,

16   prayed with David, and I went as far as to have

17   Chaplain Jamiu, who was there at the time, come

18   down and pray with us.

19        And just set goals.  Like I said, you

20   know, you come out of these restraints and --

21   the one person that meant probably the most to

22   him was his sister that he had contact with.

1    You know, we would set that goal, even though

2    he was on phone restriction.  It was a

3    management tool that if I could get a phone

4    call approved through the warden, he was the

5    only one that could approve it, that we set a

6    goal of, you know, based on your behavior,

7    goal-oriented actions.  You know, come out of

8    these restraints we'll look at good behavior,

9    towards the end of the week we'll sit down and

10   call your sister.

11        His grandmother was important to him.

12   He often talked about his grandmother, but his

13   sister was the one that was always a good

14   management tool for me to use with David

15   Womack.  During the time that I was seg.

16   lieutenant, I know we sat down and placed a

17   couple of calls to his sister.  It was hard.

18   She worked a lot.  It was hard to get through.

19        And ordinary phone use in the Special

20   Housing Unit is they bring the phone down and

21   give you the option to get on it.  If you

22   call -- you're allowed a phone call every 30

1    days.  And if you call and the person you want

2    to talk to is not there, you get an answering

3    machine, it still sort of counts as your call,

4    because you placed a call.  204 inmates to

5    accommodate.

6         With David Womack, I always made sure

7    that I was the one that gave him the phone

8    call.  That if he was asking for it, I set it

9    up with the warden to get approval, and we'd

10   sit there until we got through to his sister.

11   And he knew that I would do that for him.

12        So I would try to set goals like that.

13   And I believe that day that was one of the

14   things, we were setting -- we were looking

15   forward to making a call to his sister.  And I

16   think that was a big help sitting there and

17   good faith that I had the chaplain there and

18   psychology there.  And it was like I had people

19   lined up to talk to him to try -- come on.

20   This is getting ridiculous, staying in this

21   amount of time.

22        So what more -- I mean, my head was

1    touching the ground.  I was bending over

2    backwards trying to get this individual out of

3    restraints.

4  BY MR. HEWITT:

5    Q.    And these efforts that you were just

6  talking about with the chaplain and with psychology

7  and with calling his sister, was that on the final

8  day that he was in restraints?

9    A.    Right.

10    Q.    Had you ever made any such efforts

11  prior to that?

12    A.    Not to the extent.  That day I just --

13  everybody was making their rounds that day, so I

14  was able to sort of corral them all in there at the

15  time to get the restraints off of him.

16         But the -- yeah, it was often -- like I

17  said earlier in my interview or testimony or

18  whatever this, everything that I did with David

19  Womack was goal oriented.  This is what we're going

20  to do.  You know, if I had a project that was

21  isolated, even though he was a high maintenance

22  inmate to have in the Special Housing Unit, I had

1    to find tools that I could manage this guy with.

2              And if that meant something as menial

3    as folding laundry, just to get out of that cell

4    for an hour a day -- I really didn't need laundry

5    done, but I knew getting him out of that cell and

6    getting him into a secure area -- and it had to be

7    a secure area.  He couldn't just be out with like

8    an ordinary orderly walking down the ranges like an

9    orderly in the Special Housing Unit.

10             I would find work that needed to be

11   done.  Maybe something would need painted.  Another

12   cell would need painted that was empty.  Hey, Dave,

13   would you paint this for me?  Just to keep his mind

14   busy.  To help manage him.  To get him there.  To

15   keep him busy.  It was day to day with him.  Like I

16   said, he goes zero to a hundred in a hurry.

17             But little things like that I found, as

18   the SHU lieutenant, worked for me in managing David

19   Womack.  So, yeah, the entire time he was in

20   restraints, the entire time he was coming back from

21   the hospital, I mean, I was standing down at the

22   door talking to him, saying these things that I'm

1    telling you.  You know.

2          The day that I was trying to get his

3    restraints off, I know I had some cells that need

4    painted and that was something I was using as a

5    management tool.  Hey, get these restraints off.  I

6    have a couple cells up there that I'm going to have

7    you paint tomorrow.  I'm going to get you out of

8    your cell for a little bit.

9          Those were some of the things I was

10   doing to try to better manage him.  So, yeah, it

11   was all along.  The entire time that he was in

12   restraints, those were efforts that were made on my

13   part.

14       Q.     Previously you were discussing about --

15   you had mentioned him getting transferred.  What

16   was that about?

17       A.     It's been six years ago.  I don't

18   recall what he did to get into the Special Housing

19   Unit, but he wanted a transfer out of the

20   institution, which means he didn't want to go back

21   to general population, he wanted transfer to a new

22   institution.

1          It's not one of those things where you

2    snap your fingers and you're gone the next day.

3    There's a lot of things -- a lot of hoops to jump

4    through before somebody gets transferred.  The unit

5    team has to do the transfer order, it gets routed,

6    then it goes outside the institution.  Back then it

7    was probably to the region.  Then the regional

8    designator would look, if it's a good reason to

9    transfer somebody or not.  If it is, then they have

10   to find an institution that he's compatible, that

11   he doesn't have separatee issues at.  And then we

12   put him, you know, in for transfer.

13          Once it comes back, then he waits for a

14   seat on the bus until he can get transferred from

15   the institute to a holdover institution until the

16   time when they have an empty bed.  So it's a rather

17   long process and, like I said, David wasn't one

18   where -- patience wasn't one of his virtues.  He

19   wanted instant gratification, and if he didn't get

20   it, he was going to make sure that everybody knew

21   he wasn't happy.

22        Q.    What do you mean by separatee issues?

1    A.    You and I fight, the Bureau of Prisons

2    makes us a separatee.  Keep away -- they're not

3    going to put us back in the same cell.  We're not

4    trying to run a gladiator school or anything like

5    that.  It's we're going to keep you and I apart

6    from one another.  You're going to go to another

7    prison and I'm going to maybe stay at this prison

8    or go to a completely -- a third prison.

9        Q.    Did Mr. Womack have any separatee

10   issues?

11       A.    I know he had several separatees.

12       Q.    Were any of those separatees in

13   Lewisburg?

14       A.    I don't recall.  They wouldn't have

15   been separatees out on the compound.  They wouldn't

16   have been allowed on the compound together.  So I

17   know we checked separatees when you come to the

18   jail and then before we let you on the compound to

19   ensure that you're not with somebody that you're

20   supposed to be separate from.

21       Q.    Do you recall if Mr. Womack refused to

22   take a cellmate during this time?

Page 192

1      A.      Refused to take a cellmate?

2      Q.      Yes.

3      A.      Yes, sir.

4      Q.      So he tried to manipulate a single

5  cell?

6      A.      Yes, sir.

7      Q.      Can you tell me a little more about

8  that?

9      A.      Simply that he refused to take a

10  cellmate.  He was one of those guys that tried to

11  get a following of the inmates on the range,

12  that -- with his poor behavior, and that he was

13  going to be the one that -- I'm going to set the

14  stance here.  I'm not taking a cellmate.  And if

15  you put a cellmate in here and you're responsible

16  for what I do, I'm going to hurt this guy, and then

17  would go on with the forms of bad behavior that he

18  would express to us, the forms -- the things that

19  he would do if we put somebody in there with him.

20      Q.      And how did you respond to that?

21      A.      Oftentimes I would get him to comply

22  with hand restraints and take him up to my office

1  and talk to him.  Almost like a child that was

2  throwing a bully fit.  You would have to calm him

3  down and have to work with him.  He was -- I said

4  it before, he was high maintenance.  He took a lot

5  of my day up while he was housed in the Special

6  Housing Unit.  So I would -- being from the

7  District of Columbia, I would always -- always

8  trying to find somebody from the District of

9  Columbia to house him with.

10          He -- it was hard finding somebody

11  compatible, but the times that I could find

12  somebody compatible with him, you know, I would

13  always bring that -- you know, find two or three

14  guys that he was compatible with out of 200.  It

15  wasn't that hard to do.  Even if it meant moving

16  cellmates, splitting guys up so that I could find

17  somebody for David to live with.  In cases like

18  that you have to go above and beyond to find guys

19  that get along with each other.

20      Q.    So when you say it was hard to find

21  cellmates that would be compatible with him, what

22  do you mean by that?

1    live with whites.  So as a Special Housing Unit

2    lieutenant, I take all those -- those are some

3    other things, not just geographic, but race,

4    religion, age.  You know, a young guy might not

5    want to live with an older fellow that sleeps all

6    the time.  That older guy might not want to live

7    with that young kid that's up doing push-ups all

8    night.  Several things go into making a cell

9    situation work.

10        But when it came to David Womack, my

11   head was touching the ground.  I would always try

12   to be there and be part of the decision on who he

13   went with and I would always try to bring two or

14   three options of these are the guys that I have

15   available.

16        Q.    Now, when Mr. Womack was in restraints

17   in December 2004 and early 2005, in January, did

18   you ask him to take a cell with another inmate?

19        A.    Several times, yes.

20        Q.    Did you ask him -- rather, did you

21   offer to take him out of restraints if he would

22   take a cellmate?

1    A.    That would be a step in the right

2  direction.  I often said, you know, that was almost

3  like a goal oriented -- this is what I have.  I

4  know you guys get along.  Let's go down there.  I'm

5  not taking no cellmates.  I want to stay in

6  restraints.  I don't want a cellmate.  He knew that

7  he couldn't be placed in a cell with a cellmate,

8  not in restraints -- if he were in restraints.  So

9  that was often his answer, I'm not taking

10  restraints -- or I'm not taking a cellmate.

11    Q.    So he would rather stay in restraints

12  than take a cellmate?

13    A.    Right.  If he took the cellmate, he

14  knew that the attention that he was gaining would

15  stop.  And it was more important to him to get that

16  attention, the warden's attention that he was

17  demanding the transfer, and that we speed it up.

18  And that was his -- that was his reasoning.  That

19  was his -- the tracks that his train of thought ran

20  on.

21    Q.    Now, earlier today you mentioned that

22  there are cell rotation logs in the SHU?

1     A.     Speaking personally, any time I dealt

2   with anything with Mr. Womack that was out of the

3   ordinary, if he wouldn't stand up to show me his

4   restraints, if he wouldn't allow the door to be

5   closed, if he broke the deadlock, double lock on

6   his leg irons or hand restraints, I would

7   automatically request for a modified use-of-force

8   team.

9           I didn't want myself or any of my staff

10  getting hurt.  So they donned equipment, came and

11  gave Womack a direct order to sit down on the bed.

12  Sometimes he listened, sometimes he didn't.  When

13  he saw the camera and the use-of-force team,

14  oftentimes he would listen and go ahead and sit on

15  the bed.

16          We'd go in, they would maintain control

17  of him.  Somebody wearing protective equipment

18  would reapply the restraints so that it wouldn't be

19  too tight.

20          While he spent time in restraints he

21  would remove his clothing, flush it down the

22  commode to get the commode clogged up so the cell

1    that to Mr. Oliver.

2        Q.    Did you ever witness Mr. Oliver having

3    communications with Mr. Womack?

4        A.    Yes, sir.

5        Q.    Do you recall any of them?

6        A.    Goal oriented.  I don't recall exactly

7    what they talked about.  But with Mr. Womack it was

8    always goal oriented.  They liked the fact that

9    while he was there -- he was a special management

10   inmate.  It took a lot of my time.  They would

11   compliment him on being able to work with me and,

12   you know, they were trying to reinforce that

13   relationship, you know, that rapport that he and I

14   had.

15           Other than that, there wasn't a whole

16   lot to talk to him about.  Trying to get him out of

17   restraints, you know, what are you doing?  This

18   isn't the way to go about it.  Trying to convince

19   him, much like everybody else.

20       Q.    Do you remember any specific

21   conversations that Mr. Oliver and Mr. Womack had?

22       A.    No, sir.

1      Q.    When you learned Mr. Womack was

2  engaging in the destruction of government property,

3  did you file an incident report?

4            MR. BUTLER:  Objection to form.

5            You can answer.

6            THE WITNESS:  Repeat the question,

7    please.

8  BY MR. HEWITT:

9      Q.    Sure.

10           When you learned of Mr. Womack's

11  behavior in destroying property, did you file an

12  incident report?

13            MR. BUTLER:  Same objection.

14            You can answer.

15            THE WITNESS:  I'm sure I did on

16    occasion.  Not every occasion.  It was one of

17    those deals where I'll use the slang word

18    stacking.  This guy, we're trying to get him

19    transferred and this behavior just -- where

20    we're just going to keep writing incident

21    report after incident report for the very

22    same -- similar behavior, and the more incident

1    reports we write, the longer he's going to be

2    with us.

3         We know what his behavior is.  We're

4    documenting it.  So on every occasion do I?

5    Maybe one per shift.  Do I continue to, you

6    know, when he smears feces on the mattress and

7    ruins that, destruction of government property?

8    Yeah, he's probably going to get an incident

9    report for that, because it's going to be $100

10   to replace that mattress.

11        Am I going to turn around and write him

12   up when he takes the fresh T-shirt that I just

13   gave him -- because I'm trying to get him to

14   live like a human being.  When he takes that

15   off and flushes it down the commode, am I going

16   to write a second one?  No.

17   BY MR. HEWITT:

18        Q.    Why not?

19        A.    Again redundancy.  He's continuing to

20   do the same type of behavior.  Document it and move

21   on.

22        Q.    But the incident report is the initial

1          MR. HEWITT:  Why don't we go off the

2     record.  I'd like to take a quick look at a

3     video of the incident.  Perhaps it will refresh

4     your recollection.

5          THE WITNESS:  Okay.

6                    *   *   *

7          (Whereupon, a recess was taken from

8     3:26 p.m. until 3:53 p.m.)

9                    *   *   *

10          MR. HEWITT:  Back on the record.

11     BY MR. HEWITT:

12          Q.     The video we just watched was a video

13     produced by the defendants in this matter, dated

14     January 2nd, 2005, and it depicts Mr. Womack being

15     put in restraints.  Generally speaking, that's your

16     understanding of that video?

17          A.     Yes, sir.

18          Q.     Did the video refresh your recollection

19     of the events of that day?

20          A.     Yes.

21          Q.     Before we watched the video, you were

22     talking about how Mr. Womack was refusing some

1    orders, which is in part what led to his being

2    placed in restraints on that day, correct?

3        A.    Yes, sir.

4        Q.    And so after viewing the video, it

5    appears that there were two orders that he was

6    refusing to comply with, and one was the refusal to

7    comply with being cuffed up, and the second was

8    refusing to comply with an order to take a

9    cellmate; is that correct?

10       A.    That is correct.

11       Q.    And it appears that Mr. Womack was

12   initially -- well, at the beginning of the video he

13   was being held in an ADX cell, correct?

14       A.    Yes, sir.

15       Q.    And that cell number was Cell 229,

16   correct?

17       A.    Yes, sir.

18       Q.    And that Jennifer Hunter, the staff

19   psychologist, was present at that time and engaged

20   in confrontational avoidance, correct?

21       A.    Yes, sir.

22       Q.    And that confrontational avoidance was