# EXHIBIT 15

# Transcript of the Testimony of **Jennifer Lynn Hunter**

**Date:** April 26, 2010

**Case:** David Lee Womack v. Joseph V. Smith, et al.,

Printed On: 5/5/2010



Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

3

4                      *   *   *

5

6   DAVID LEE WOMACK,              : CIVIL ACTION

7           Plaintiff              :

8        vs.                       :

9   JOSEPH V. SMITH, et al.,       :

10          Defendants             : NO. 1:CV-06-2348 CCC

11

12                     *   *   *

13

14      Oral deposition of JENNIFER LYNN HUNTER,

15   Psy.D., taken at USP Lewisburg, Training Center,

16   2400 Robert F. Miller Drive, Lewisburg,

17   Pennsylvania 17837, on Monday, April 26, 2010,

18   beginning at 10:32 before Nancy J. Taguinot, RPR,

19   CCR(NJ), Registered Professional Reporter and

20   Notary Public in and for the Commonwealth of

21   Pennsylvania.

22

1  that to your attention. So the rounds are not --

2  again, it's not a formal going door to door

3  speaking necessarily with every individual. It's

4  kind of being there, making yourself available if

5  issues were brought to your attention.

6      Q.    How frequently would you do rounds in

7  the SHU?

8      A.    Someone from psychology would do rounds

9  at least once a week. It wouldn't always be me.

10 That would, you know, certainly depend kind of on

11 scheduling and opportunity. Oftentimes it might be

12 my supervisor or any of the other psychologists.

13 But somebody from the psychology department would

14 once a week do rounds on each floor.

15     Q.    And when that person from psychology

16 goes to make rounds in the SHU, do they typically

17 sign or initial an entrance log into the SHU?

18     A.    Yes.

19     Q.    Is that required by BOP policy?

20     A.    I believe so.

21     Q.    And during the time period in question,

22 which is from February 2004 to February 2005, were

1  A.  I do not know.

2  Q.  We can put that document to the side
3  for the time being.

4      Did Mr. Womack face a substantial risk
5  of harm by being placed in restraints for an
6  extended period of time?

7  A.  What would "substantial risk of harm"
8  be?

9  Q.  Could he have been physically injured
10 by being placed in restraints for an extended
11 period of time?

12 A.  I wouldn't really be able to answer
13 that as far as medically.  I don't know.  I know
14 they do have to do regular checks of the restraints
15 to ensure that, you know, the circulation isn't
16 compromised and other -- other things to -- again,
17 to ensure that medically they're not causing
18 problems.

19 Q.  And are there any psychological harms
20 that could result from the extended use of
21 restraints?

22 A.  Possibly, yes.

1  Q.    Such as what?

2  A.    It would be very -- you know,
3  individual to the person involved.  You know,
4  certainly in the same way as anybody placed in the
5  Special Housing Unit sometimes can have some
6  increased stress.  So particularly we would be more
7  concerned about somebody that maybe has documented
8  mental illness, potential to decompensate.

9  Q.    What does decompensate mean?

10 A.    Generally, just to -- maybe for them
11 to -- for their condition to worsen, maybe for
12 symptoms to get more severe or maybe for symptoms
13 to kind of emerge that maybe had been -- had not
14 been present before.

15 Q.    And you had mentioned increased stress.
16 What do you mean by that?

17 A.    Well, the stressful environment,
18 certainly can cause some people to have some mental
19 health kind of reaction or response to that.

20 Q.    And would be it fair to say that the
21 longer someone remains in restraints, the more harm
22 they can be at risk of?