**EXHIBIT 16**



MIDWEST
LITIGATION
SERVICES
COURT REPORTING
& VIDEO

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID LEE WOMACK
VS.
HARLEY LAPPIN, et al.

Case No. 1:CV-06-2348

VOLUME 1

VIDEOTAPED DEPOSITION OF DAVID LEE OWENS WOMACK, III

JUNE 24, 2010

NATIONWIDE SCHEDULING

OFFICES
MISSOURI Springfield  Jefferson City  Kansas City  Columbia  Rolla  Cape Girardeau
KANSAS  Overland Park  ILLINOIS  Springfield  Champaign  Chicago

HEADQUARTERS: 711 North Eleventh Street, ST. Louis, Missouri 63101
800.280.3376
www.midwestlitigation.com

Page 1

```
 1       IN THE UNITED STATES DISTRICT COURT
       FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2
 3
 4   DAVID LEE WOMACK,        )
                              )
 5       Plaintiff,           )
                              )
 6   vs.                      ) Case No. 1:CV-06-2348
                              )
 7   HARLEY LAPPIN, et al.,   )
                              )
 8       Defendants.          )
 9
10
11
12
13                    VOLUME 1
14
15   VIDEOTAPED DEPOSITION OF DAVID LEE OWENS WOMACK, III
16
17          Taken on Thursday, June 24, 2010
18                At 11:22 o'clock a.m.
19   At U.S. Medical Center, 1900 West Sunshine Street
20                Springfield, Missouri
21
22
23
24
25   REPORTED BY: PAULA C. VOYLES, CCR, RPR, CRR
```

Page 2

```
 1
 2
 3                    I N D E X
 4   WITNESS                                   Page
 5   DAVID LEE OWENS WOMACK, III
 6     Examination by Mr. Butler ..............5
 7
 8
 9
10
11
12                (No Exhibits)
13
14
15
16
17
18
19
20
21
22
23
24
25   CERTIFICATE OF REPORTER ..................180
```

Page 3

```
 1   APPEARANCES:
 2   For Plaintiff:
       AARON B. HEWITT
 3     ahewitt@morganlewis.com
       PHILIP FORNACI
 4     MORGAN, LEWIS & BOCKIUS, LLP
       1111 Pennsylvania Avenue, N.W.
 5     Washington, D.C. 20004
       Tel: 202.739.5264, Fax: 202.739.3001
 6
     For Defendants:
 7     MICHAEL J. BUTLER
       michael.j.butler@usdoj.gov
 8     Assistant United States Attorney
       UNITED STATES ATTORNEY'S OFFICE
 9     228 Walnut Street, 2nd Floor
       P.O. Box 11754
10     Harrisburg, PA 17108
       Tel: 717.221.4482, Fax: 717.221.2246
11
     Also Present:
12     JANETT DIXON, Telepsychiatry Coordinator
13   Video Specialist:
       AMANDA LAU
14     UNITED STATES ATTORNEY'S OFFICE
       228 Walnut Street, 2nd Floor
15     P.O. Box 11754
       Harrisburg, PA 17108
16     Tel: 717.221.4482, Fax: 717.221.2246
17   Reported by:
       PAULA C. VOYLES, RPR, CRR, CCR No. 750
18     MIDWEST LITIGATION SERVICES
       1911 South National Avenue, Suite 402
19     Springfield, MO 65804
       Tel: 417.877.9700, Fax: 417.877.9704
20
21
22
23
24
25
```

Page 4

```
 1                 P R O C E E D I N G S
 2
 3       THE VIDEOGRAPHER: My name is Amanda Lau. I
 4   am employed by the Department of Justice at the U.S.
 5   Attorney's Office at 228 Walnut Street, Harrisburg, PA.
 6       I am currently located at this address and
 7   will be videotaping this deposition using our office
 8   video teleconference system.
 9       Today is Thursday, June 24th, 2010, and it is
10   12:23 Eastern Standard Time. The attorneys and
11   deponent in this case are presently located at the
12   United States Medical Center of Federal Prisons,
13   USMCFP, in Springfield, Missouri.
14       The deposition is being taken on behalf of
15   the defendants in the case of Womack versus Smith, et
16   al., 06-CV-2348, in the Middle District of
17   Pennsylvania.
18       Will the court reporter please identify
19   yourself?
20       THE COURT REPORTER: Paula Voyles.
21       MR. BUTLER: Would you please identify your
22   identify your employer.
23       THE COURT REPORTER: Midwest Litigation
24   Services.
25       MR. BUTLER: Would you swear the witness in?
```

Page 33

1 Q. (By Mr. Butler) Sign anything. If
2 somebody asked you to sign something, you'd be able to
3 write your signature?
4 A. Yes.
5 Q. Who is Eleanor Holmes?
6 A. Congress.
7 Q. Have you ever written her?
8 A. I cannot write. I don't understand.
9 Q. Has anyone written on your behalf to
10 her?
11 A. Yes.
12 Q. Okay. And who has written to her on
13 your behalf?
14 A. First inmate I had at Lewisburg when I
15 came out of ambulatories.
16 Q. And who was that?
17 A. Pratt.
18 Q. What was the first name?
19 A. I just know him by Pratt.
20 Q. Any other inmates write Eleanor Holmes
21 for you?
22 A. Yes.
23 Q. Who?
24 A. Ubay (phonetic).
25 Q. Ubay? E-U-B-A-Y or U-B-A-Y?

Page 34

1 A. I don't know.
2 Q. Is that from Lewisburg or somewhere
3 else?
4 A. No. It's from New Jersey.
5 Q. And how do you know Eleanor Holmes?
6 A. How did I first come to know who she
7 was?
8 Q. Yes, sir.
9 A. An inmate gave me her name.
10 Q. And where is she located? She's
11 somebody in Congress?
12 A. She's a congressperson.
13 Q. From where?
14 A. Washington, D.C.
15 Q. From where you grew up?
16 A. I was born in D.C., but I didn't grow up
17 all 100 percent in D.C.
18 Q. Whereabouts? What neighborhood does
19 Eleanor Holmes represent? Do you know? Is she a
20 representative of the neighborhood that you are
21 familiar with?
22 A. No.
23 Q. Does she know your family?
24 A. Define "know."
25 Q. Has she ever met them?

Page 35

1 A. Yes.
2 Q. Who has she met?
3 A. I believe my grandmother.
4 Q. What's your grandmother's name?
5 A. Sylvia Patricia Steele.
6 Q. Anyone else that she met?
7 A. I think my mother.
8 Q. What's your mother's name?
9 A. Gail Collins.
10 Q. And why did they meet Eleanor Holmes, as
11 far as you know?
12 A. Because I was being tortured by
13 Lewisburg.
14 Q. So they've had a meeting with
15 Congresswoman Holmes about your case about the
16 restraints?
17 A. I don't know if it was about the
18 restraints specific, but about what was being done to
19 me.
20 Q. When you say "tortured," define what you
21 mean by "torture."
22 A. Any time you do something to somebody
23 against their will that cause them mental, spiritual,
24 or physical pain.
25 Q. How did anyone in this case do what you

Page 36

1 just defined as torture to you?
2 A. Are you asking me how do I know that
3 they knew that?
4 Q. No. You're right. That was a bad
5 question. Let me rephrase that.
6 How -- let's take it back. You define
7 "torture" again. Tell me your definition of "torture"
8 again.
9 A. If you do something against someone will
10 that cause them physical, mental, or spiritual pain.
11 Q. Okay. Has the warden, Joseph Smith,
12 done something against your will that's caused you
13 physical, emotional, or spiritual pain?
14 A. Yes.
15 Q. What has he done?
16 A. Put me in ambulatories for no reason.
17 Q. What else has he done?
18 A. He gave a order for his staff members to
19 continue doing what he ordered them to do, which is
20 keep me in ambulatories.
21 Q. What else?
22 A. What else did he do?
23 Q. Mm-hmm.
24 A. Come to my door and threaten me
25 verbally.

Page 37

1 Q. How was that against your will to cause
2 you physical, emotional, spiritual pain?
3 A. Because he gave an order for me to stay
4 in ambulatories, until he says otherwise. And by me
5 being in ambulatories, and the way in which they put
6 them on me, they was clamped all the way tight on me
7 until they cut my circulation off. They was digging
8 into my skin, opening up wounds, opening up my flesh.
9 I was bleeding. I couldn't lay flat comfortably, or
10 where I wasn't in pain. I couldn't move an inch
11 without the restraints constantly cutting into me.
12 I had to pray, sing songs, think about
13 movies, do anything I could to remove my mind from the
14 physical pain I was in.
15 Q. Okay. And what else? What else has he
16 done to cause you -- against your will to cause you
17 physical, emotional, spiritual pain?
18 A. That he continually repeated that by
19 leaving me in them for long periods of time.
20 Q. I think we covered the he ordered you to
21 be in ambulatories, and he required you to continue to
22 be in it. But is there anything else that he did that
23 would meet your definition of "torture"?
24 A. Yeah. He came into my cell. The only
25 way I can answer this is to say, if I come to you now

Page 38

1 and I put you in ambulatories, and you know what I'm
2 doing to you is wrong, you know that what I'm doing is
3 wrong, and I said, "You're going to remain in these,"
4 that mean I'm letting you know mentally this is what we
5 going to do.
6 That's no different than me kidnapping you,
7 and not knowing whether I'm going to kill you or not.
8 So mentally you're suffering, you're worrying. So
9 that's torture.
10 Spiritually you're torturing, because now
11 you're seeking, is your God allowing this to happen?
12 How you supposed to come to peace with it? Do you
13 fight back? Do you submit and say, "Well, Lord it's in
14 your hand." So that's the mental, spiritual torture.
15 And the physical is that you're suffering
16 because you've been restricted, and then your body
17 going through un -- different changes, meaning the
18 wounds are opening up, and then they kinda dry up after
19 so many hours. But then the least move you make, it
20 opens the wound up even more. So then you got to feel
21 that pain in the morning, that burning.
22 Then you can't lay down. Then the officers
23 coming in the cell, slamming you, taunting you verbal.
24 All this through the direct order of the warden.
25 So that's why I said that.

Page 39

1 Q. Okay. So is that it? That's it; right?
2 A. Is that all that he did?
3 Q. Yes.
4 A. Yeah. He just basically said -- his
5 actions, verbal and physical, basically let me know he
6 didn't care.
7 Q. Okay. Now, how about the -- this
8 individual's name is Scott Dodrill. Do you know who
9 that is?
10 A. No. Not by that name.
11 Q. Okay. Do you know the regional
12 director? Let's go by a title. The regional director.
13 What did the regional director do to you?
14 A. It's what he didn't do.
15 Q. So did he torture you?
16 A. Yes. He allowed me to be tortured.
17 Q. And how so?
18 A. Due to his -- his rank or authority over
19 top of the people that was doing the whoopin', so
20 forth. By him not telling him to cease from what they
21 was doing, and he had knowledge of it, that tells me
22 that he didn't see no wrong in what they was doing,
23 when he should have.
24 Q. Okay. Anything else that would meet
25 your criteria of torture, your definition of "torture,"

Page 40

1 that the regional director, D. Scott Dodrill, would do?
2 Anything else?
3 A. Only way I could answer that to
4 hopefully make it clear to you, the way I look at it is
5 if I come in this room and see someone physically doing
6 harm to you, and I turn around, walk away, then I'm
7 doing just as much harm as that person that's
8 physically doing it to you because I'm not trying to
9 assist them from hurting you.
10 Q. All right. But how about anything else?
11 Did he do anything else to you?
12 A. That in itself.
13 Q. Okay. So that was it?
14 A. By him not telling the warden and any
15 other person that was allowing me to be in the
16 ambulatories and suffer like I was to stop, to me he's
17 doing just as much as what they doing, because he have
18 the authority to tell them to stop, whether they have
19 the intelligence to do it or not.
20 And then when I filed the system 10, I was
21 told that I couldn't do that. But BOP policy says you
22 can.
23 Q. How about Kenneth Gabrielson? He was
24 the lieutenant of the SHU at the time; is that right?
25 A. Yes.

Page 61

1 A. When my mother -- I asked my mother,
2 "What is this on my neck?" Since I've been living, I
3 don't know how I got it. And she said, "You got burned
4 by boiling water and you received cuts. The doctor
5 says it's called a kelo." It comes from a cut that
6 heals a lump above the skin.
7 Q. Okay. Say that word slowly.
8 A. Kelo.
9 Q. Okay. So you had a kelo on your wrists?
10 A. No. I got -- I had open wounds --
11 Q. Open wounds?
12 A. -- in both wrists, and my arm, my
13 ankles.
14 Q. Now, the size of the wound that you had
15 at the time when you were in restraints, is it the size
16 of that mark you have on your wrist, or was it deeper?
17 Was it smaller?
18 A. It was -- you could see the white of my
19 meat, and it was bleeding, and it smelled foul.
20 Q. How big was it on your wrist?
21 My wrist is skinny, so I can't really use my
22 wrist as a guide. But was it wide? Was it narrow? Or
23 was it just that same size that you got right there
24 (indicating)?
25 A. Well, I don't know how -- if it healed

Page 62

1 the same size or if it was -- 'cause you can be cut and
2 be -- it can be deeper or open wide, but when it heal,
3 it have a small healed area.
4 Q. So was it bleeding constantly?
5 A. Yeah. 'Cause the handcuffs remained
6 down inside it. So every time I move, the handcuff
7 would lift up a little bit and hit the sides like
8 constantly.
9 Q. So did you have blood dripping down your
10 hands?
11 A. Nah. I had blood around my wrists.
12 Q. And was that dripping off your wrists?
13 A. Yeah. Blood, and I don't know the legal
14 term for the word. Liquid, like pus, or whatever you
15 call it.
16 Q. I don't think there is a legal word for
17 it. You mean the medical term for it?
18 A. Yes. I can just describe it. I don't
19 know what you would properly call it.
20 Q. What does it look like?
21 A. It was like grayish-white. I don't
22 know. Only thing I know to describe is like blood,
23 pus.
24 Q. And so this was coming -- was it coming
25 out like -- you know, if you cut shaving, it comes out

Page 63

1 pretty fast; right?
2 A. Right.
3 Q. Was it coming out like that?
4 A. At times. Whenever the -- whenever
5 the -- when it first started, no. But then over a
6 course of time it got more -- I don't know if the
7 proper word is open or deeper or what. But by the
8 handcuff constantly going in it, it was causing me pain
9 because I couldn't remove the handcuff from that area.
10 So it was constantly being -- I don't know
11 whatever the word is to describe it. But it is like
12 you got a cut. Instead of healing it or putting
13 something on it, you constantly sticking an object in
14 it, just keep on opening it up and keep causing it to
15 bleed, and other fluids running out of it.
16 Q. Did you feel nauseous because of this
17 injury that you had?
18 A. I can't say I feel nauseous because if
19 it was the injury or just all that I was going through.
20 Q. Did you think you lost a lot of blood?
21 A. I don't know what would define "a lot."
22 Q. Well, what would you define as "a lot"?
23 A. My blood, period.
24 Q. So was there a puddle of blood on the
25 floor?

Page 64

1 A. No.
2 Q. So it wasn't that much blood that would
3 go on to the floor?
4 A. Yeah. It dropped on the boxers that I
5 had on, so I'm quite sure I had little spots on the
6 floor.
7 Q. Just a few spots? Not stains, blood
8 stains?
9 A. Well, I guess if it dropped, that would
10 lead to it being a stain. So I don't. . .
11 Q. You had stains on your boxer shorts? Is
12 that what you're saying?
13 A. Yeah. Because I was moving, trying to
14 move the handcuff. And in the process, you know,
15 either from it coming directly from that, or being on
16 like this part of the handcuffs (indicating), it got on
17 my boxers or got on the sheet. I can't say if it fell
18 directly from that to the floor, or directly from that
19 on the sheet, or directly from that on my boxers, or it
20 being on the handcuffs and rubbed against my boxers, or
21 rubbed against the sheet, 'cause I wasn't like focused
22 on that, like constantly locked in on that.
23 Q. How many times did you ask Lieutenant
24 Gabrielson for medical assistance that was denied?
25 A. Twice.

Page 181

```
 1    IN THE UNITED STATES DISTRICT COURT
      FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2
 3
 4   DAVID LEE WOMACK,        )
                              )
 5       Plaintiff,           )
                              )
 6   vs.                      ) Case No. 1:CV-06-2348
                              )
 7   HARLEY LAPPIN, et al.,   )
                              )
 8       Defendants.          )
 9
10
11
12
13                VOLUME 2
14
15   VIDEOTAPED DEPOSITION OF DAVID LEE OWENS WOMACK, III
16
17         Taken on Friday, June 25, 2010
18              At 8:14 o'clock a.m.
19   At U.S. Medical Center, 1900 West Sunshine Street
20               Springfield, Missouri
21
22
23
24
25   REPORTED BY: PAULA C. VOYLES, CCR, RPR, CRR
```

Page 182

```
 1                  I N D E X
 2   WITNESS                                Page
 3   DAVID LEE OWENS WOMACK, III
 4     Examination by Mr. Butler .................183
 5     Examination by Mr. Hewitt .................334
 6
 7
 8
 9              E X H I B I T S
10   Exhibit No.                           Page
11     1   Document Bates Labeled Womack 0007   214
12     2   Document Bates labeled DEF1589       230
13     3   Declaration of David Lee Womack      234
14     4   Various Bates labeled documents      250
15        (No Exhibit No. 5 presented)
16     6   Interrogatories/Answers to           294
          Interrogatories
17
      (The original exhibits are attached to the original
18    transcript, and copies provided to all counsel.)
19
20
21
22
23
24
25   CERTIFICATE OF REPORTER ................336
```

Page 183

```
 1   APPEARANCES:
 2   For Plaintiff:
        AARON B. HEWITT
 3      ahewitt@morganlewis.com
        PHILIP FORNACI
 4      MORGAN, LEWIS & BOCKIUS, LLP
        1111 Pennsylvania Avenue, N.W.
 5      Washington, D.C. 20004
        Tel: 202.739.5264, Fax: 202.739.3001
 6
     For Defendants:
 7      MICHAEL J. BUTLER
        michael.j.butler@usdoj.gov
 8      Assistant United States Attorney
        UNITED STATES ATTORNEY'S OFFICE
 9      228 Walnut Street, 2nd Floor
10      Harrisburg, PA 17108
        Tel: 717.221.4482, Fax: 717.221.2246
11
     Also Present:
12      JANETT DIXON, Telepsychiatry Coordinator
13   Video Specialist:
        AMANDA LAU
14      UNITED STATES ATTORNEY'S OFFICE
        228 Walnut Street, 2nd Floor
15      Harrisburg, PA 17108
16      Tel: 717.221.4482, Fax: 717.221.2246
17   Reported by:
        PAULA C. VOYLES, RPR, CRR, CCR No. 750
18   MIDWEST LITIGATION SERVICES
        1911 South National Avenue, Suite 402
19      Springfield, MO 65804
        Tel: 417.877.9700, Fax: 417.877.9704
20
21
22
23
24
25
```

Page 184

```
 1              P R O C E E D I N G S
 2
 3        THE VIDEOGRAPHER: Okay. Today is Friday,
 4   June 25th, at 9:15 Eastern Standard Time. This is
 5   segment two of the deposition.
 6        MR. BUTLER: Of David Lee Womack; correct?
 7        THE VIDEOGRAPHER: Correct.
 8        MR. BUTLER: Thank you.
 9        THE VIDEOGRAPHER: Womack v. Smith.
10        MR. BUTLER: You can give the docket.
11        I'll give the docket.
12        THE VIDEOGRAPHER: Okay. 06 --
13        MR. BUTLER: 2348.
14        Thank you, Amanda.
15        THE VIDEOGRAPHER: You're welcome.
16
17   Whereupon
18         DAVID LEE OWENS WOMACK, III
19   having been previously duly sworn, was examined and
20   testified as follows:
21         EXAMINATION (Continued)
22    Q.  (By Mr. Butler) Mr. Womack, we are back
23   on the record. You understand that you are still under
24   oath from yesterday?
25    A.  Yes.
```

Page 257

court line in my life concerning Gabrielson was when I was in the ambulatories in ADX cell, when Gabrielson said I took my hand and went across my throat, saying I was going to cut his head off. That's the only time I ever went.

And I believe that day was like on the 20th or something that Gabrielson wrote me up saying that I tried to cut his head off. But then in the write-up, he said he was aware that I wasn't talking to nobody in the institution as far as staff for like two weeks. And that same doctor represented me as my staff rep.

So it's like you putting two together. Like that incident; me saying, if I'm standing here, that I went to court line. And they never found me guilty for assault, it couldn't be assault.

Q. All right. Go to -- okay. Turn the page.
A. (Complying).
Q. Did you ever see the next two pages before?
A. Next two?
Q. Yeah.
A. I can't say I have 'cause I don't know what it is. It's something that's typed on it, though.

Page 258

Q. Did you ever see anything similar to this?
A. How would I know that? That's like you grabbed something right there and say --
Q. Turn the page. Turn the page. When is it dated?
No, no, no. You're on the right page. When is this dated?
A. Fourth month, the first of the month, '05.
Q. And do you recognize whose signature that is?
A. No.
Q. Turn the page. Do you recognize the next page?
A. There's another grievance form, like a PP9.
Q. Who wrote this?
A. I can't tell from the -- 'cause the way they xeroxed, I don't know if these lower lines that I would make, or if that's just something from it being xeroxed.
Q. Do you have the original of this document?
A. I don't have no legal documentation from

Page 259

what happened in Lewisburg to me.
Q. Do you know whose handwriting that is?
A. I can't even tell if it's my handwriting. But if there -- I can see the signature right here. That look like my name right here. I wrote this right here (indicating).
Q. So you say you believe you did write this?
A. No. I'm saying that look like my handwriting, signed right here (indicating). Print. In print. Looks like something how I write. But I can't see the name up here, and I can't really make out the letters, the form of the letters. I know what letters they are, but I can't --
Q. You can't tell whether or not you wrote that?
A. Yeah. Because the way it's xeroxed, it's like. . .
Q. If you had the original, would that be easier to read?
A. I can tell you the letters on here. I can see some of the letters on here. I see F, U, or F, O, R, T. Like H. No, that's F, U, R, T, H, E, R.
Q. I'm going to ask you to speculate. Do you believe if you had the original copy

Page 260

of this, you'd be able to read to see if it was your handwriting?
A. I should, if I had the original. I should.
Q. All right. Turn to the next page.
A. (Complying).
Q. Did you ever see this document before?
A. I don't know what it is.
Q. Did you ever see anything similar to it?
A. I can't say I has or I haven't.
Q. Has the region ever responded to any of your administrative grievances?
A. Directly to me?
Q. Mm-hmm.
A. I know as soon as I got in the cell with Pratt, Tim Tim said -- I asked the case manager for a 8 and a 9. He said, "I don't have those." And Tim Tim say, "No, Womack, because you filing against the warden, you file an Assistive 10."

So I filed Assistive 10, and that came back instructing me that I got to start from the 8 on up. So if that came from the regional, yeah. But I tore that up, though. And that's when I waited to get the 8.
Q. Did you -- do you recognize this -- have

Page 269

1  It is clearly written on my incident report by UDC team
2  that I requested for the camera on the tear of date
3  12-9-04 to be seized as evidence. I spoke to SIS
4  officer on 1-5-04 while in cell 229. I showed him the
5  incident report were I requested for the camera, and he
6  said that he had seen the tape and didn't see me
7  assaulting anyone.
8  "At my disciplinary hearing, DHO Buck told me
9  that there was no camera to be looked at, which is
10  breaking BOP policy. I have a right for the camera
11  used during my hearing as evidence which he denied me
12  to further try to" -- something scratched out -- "cover
13  up what Lieutenant Gabrielson lied about Mrs. Norton.
14  "On 2-7-05 I sent a sensitive BP-9 to the
15  regional office and have reason to believe that it did
16  not get there do to me attempting to send many letters
17  to my family about the wrong" -- something -- "was done
18  to me which I" -- something -- "received any responds
19  from my family in months on" -- I can't make that out.
20      A. That's what I was telling you earlier
21  about when I took the pills in the regular SHU.
22      Q. "Each copy of legal letter that my
23  lawyer Matthew M. Robinson --"
24      A. That's the law firm I told you I spent
25  the 24,000, but I didn't want a celly.

Page 270

1      Q. -- "313-381-8033 facsimile, directed it
2  attention to warden" -- I can't make that out -- "about
3  them not hearing from me in months. Please assist me
4  in sending sensitive BP-10 to the regional office,
5  because you have made it clear to me in the past that I
6  must file all necessary remedy when wrong is being done
7  to me. And I believe that they" haven't -- "they have
8  not" -- I can't make that out.
9  "It is clear to me that the warden is trying
10  to cover up the wrong that has been done to me for I
11  know -- as I'm sure you know that BOP policy states
12  that an inmate is only supposed to be placed
13  ambulatories when he poses a threat to himself or
14  others. So" -- I can't read that -- "was I wrongfully
15  left in ambulatory for 26 days straight. When you
16  write me back, please send me a copy of things I've
17  sent" -- I can't say that -- "K-I-M-A." I don't know
18  what that means.
19  Next page is a copy, left to right -- what's
20  the word I'm looking for?
21  Next page is 00243. "It has not been tapered
22  with. Thanks for your time and concern. God bless and
23  hope to hear from you soon.
24  "Here is the address to the regional office."
25  Do you remember writing this or asking

Page 271

1  someone to write this to Congresswoman Norton?
2      A. Yes.
3      MR. HEWITT: I just want to clarify for the
4  record that you stated it was a BP-9 and not a BP-10
5  about midway down the second page of this letter.
6      MR. BUTLER: It said "sent a sensitive BP-9"?
7  Did I say that?
8      MR. HEWITT: Yeah. You said BP-9.
9      Q. (By Mr. Butler) BP-10. I apologize.
10     A. That's the one I told you I -- one of
11  the records that I sent.
12     Q. You sent the Congresswoman Norton a
13  BP-10 on 2-14-05?
14     A. If this, what you just read, says I sent
15  to it to her, then that mean I sent a copy of the -- I
16  don't know if I actually sent a BP-9.
17  Yeah, I do remember sending her BP-9 or
18  BP-10, asking her -- yeah, I do remember sending it to
19  her, asking her to mail it off to them.
20     Q. So would you agree that as of 2-14-05,
21  you had a BP-10 that you could send Congresswoman
22  Norton?
23     A. You saying of that date?
24     Q. Yeah. As of that date, isn't it true,
25  if you sent her a BP-10 on 2-14, that you had it as

Page 272

1  early as 2-14-05?
2      A. Yeah. I got -- I came out the ADX cell
3  on the 4th. That's the same day the case manager on
4  the tier. I moved in Celly Pratt. Tim Tim across.
5  Asked for a 8 and a 9. He said he didn't have it.
6  Then Tim Tim say, "Nah, Womack. You filing against the
7  warden, you can file a sensitive 10."
8  I said, "I don't know what that is. He said,
9  "You can go straight to the region."
10  I asked the case manager, who still in front
11  of my cell 410. Then I told Pratt. Pratt wrote it
12  out, and I mailed it off that following week. That
13  Wednesday or Tuesday, next week, I gave it to the case
14  manager.
15     Q. So based on Tim Tim's advice, you
16  requested the BP-10?
17     A. Yeah. And then when I got the 10 back,
18  the region, if that's who responds, instruct me that I
19  had -- that they were not going to accept it because I
20  didn't do it the right way. I got to start from the 8.
21  So I tore it up. And Tim say, "You should have never
22  tore that up. You should have kept that."
23     Q. Go to page 103. I'm not going to read
24  this entire thing.
25     A. 103?