**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVID LEE WOMACK,** | : | **CIVIL ACTION NO. 1:06-CV-2348** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **JOSEPH V. SMITH, KENNETH** | : | |
| **GABRIELSON, D. SCOTT** | : | |
| **DODRILL and JOHN OLIVER,** | : | |
| | : | |
| **Defendants** | : | |

**MEMORANDUM**

Presently before the court is defendants' motion for summary judgment (Doc.

149) in which defendants assert that plaintiff David Lee Womack ("Womack") failed

to exhaust his administrative remedies as required under the Prison Litigation

Reform Act ("PLRA"), 42 U.S.C. § 1997e(a).  In the alternative, defendants claim

that they are entitled to qualified immunity.  For the reasons that follow, the motion

will be denied.

I.     **BACKGROUND**

A.     **Statement of Facts**[1]

The court will only briefly recite the facts as they have previously been set

forth in great detail in this court's prior opinion, see Womack v. Smith, Civ. A. No.

1:06-CV-2348, 2008 WL 822114 (M.D. Pa. Mar. 26, 2008), and in the Third Circuit

---

[1] In accordance with the standard of review for a motion for summary
judgment, the court will present the facts in the light most favorable to Womack, the
non-moving party.  See infra Part II.

opinion, see Womack v. Smith, 310 Fed. App'x 547 (3d Cir. 2009), reversing and remanding this court's earlier decision.[2]

## A.   **Womack's History in BOP Custody**

Womack was transferred into federal custody from the District of Columbia in 2001. In August 2003, he was assigned to the United States Penitentiary in Lewisburg, Pennsylvania ("USP Lewisburg"). (Doc. 150 ¶¶ 1-3; Doc. 155 ¶¶ 1-3). The dispute in this case centers around the decision of certain USP Lewisburg officials to maintain Womack in ambulatory restraints from December 8, 2004 to January 3, 2005.

From 2001 to August 2003, while in federal custody, Womack received more than fifty disciplinary incident reports for offenses including assault, destruction of property, possession of dangerous weapons, refusal of orders, threats of bodily

---

[2] Plaintiff asserts that defendants' Exhibits A-C, J-V, and a submitted video are unauthenticated, inadmissible hearsay and should not be considered by the court. (Doc. 155, at 2 n.1). In response, defendants provide authenticating affidavits for each BOP document and video. In addition, defendants note that Exhibit B is the deposition transcript of plaintiff Womack, qualifying as both admissions and statements sworn under oath. (Doc. 159, at 2-3, Ex. 1-7).

Defendants contend that the court should not consider Womack's declaration of May 18, 2007. (Doc. 156, Ex. 2). Womack claims to be illiterate and demonstrated at his deposition that he simply does not know the contents of the declaration. Thus, defendants assert that Womack's declaration is unreliable. (Doc. 159, at 3). Further, defendants argue that counsel's affidavit does not suffice to authenticate BOP documents—the majority of plaintiff's remaining exhibits. See FED. R. EVID. 901.

The court concludes that all submitted exhibits may be considered as they are either authenticated by proper affidavit or admissible into evidence under other rules of evidence. With respect to Womack's declaration, the court will consider it part of the summary judgment record, as it states that counsel read the document to him; it also contains a signed declaration of accuracy under penalty or perjury.

harm, and self-mutilation. (Doc. 150 ¶ 41; Doc. 155 ¶ 41). He threatened or attempted to commit suicide on multiple occasions. (Doc. 150 ¶¶ 45, 46, 55, 66, 69; Doc. 155 ¶¶ 45, 46, 55, 66, 69). Psychology staff characterized Womack's behavior as "manipulative" and "designed to either change his environment or to elicit a staff response." (Doc. 150 ¶ 57; Doc. 155 ¶ 57). Prison officials conducted several mental health evaluations on Womack and concluded that he would be "a management problem wherever he [was] housed" (Doc. 150 ¶ 64; Doc. 155 ¶ 64).

After his transfer to USP Lewisburg in August 2003, Womack's conduct improved for several months (Doc. 150 ¶ 73; Doc. 155 ¶ 73), but turned disruptive in February 2004. Beginning in February 2004, Womack repeatedly attempted to harm himself, threatened to destroy his cell, defecated on his cell floor, lashed out at staff members by throwing objects and spitting, threatened physical harm to some staff members while refusing to acknowledge or speak to others, and hampered prison security efforts by covering the window in his cell. (See Doc. 150 ¶¶ 75-120; Doc. 155 ¶¶ 75-120).

## B.    __Restraint Period__

On December 9, 2004, a physical altercation occurred between Womack and defendant Correctional Officer Kenneth Gabrielson ("Officer Gabrielson") when Officer Gabrielson attempted to return Womack to his cell after an infirmary visit.[3]

---

[3] Womack asserts that his actions were prompted by his desire not to return to a defective cell that posed a threat to his safety. (Doc. 151, Ex. E ¶ 3; Doc. 156, Ex. 2 ¶ 3).

(Doc. 150 ¶ 126; Doc. 155 ¶ 126). Officer Gabrielson maintained control of Womack's handcuffs, reapplied additional restraints and escorted Womack to another cell. (Doc. 150 ¶¶ 128, 129; Doc. 155 ¶¶ 129, 129). Thereafter, defendant Warden Joseph V. Smith ("Warden Smith") authorized institution staff to place Womack in ambulatory restraints.[4] (Doc. 150 ¶ 130; Doc. 155 ¶ 130).

Womack remained in ambulatory restraints from December 9, 2004 to January 3, 2005. During his period in restraints Womack's conduct was at times calm and at times disruptive. Prison officials checked Womack's restraints often and recorded his behavior. (See Doc. 151, Ex. V; id. Ex. W, at 45-50; Doc. 156, Ex. 7).[5] Womack exhibited multiple periods of calm in which his restraints were checked without incident. (Doc. 156, Ex. 7, at 23-26, 34, 43, 46, 61, 64, 68). However, Womack's behavior also included refusing to speak to or acknowledge staff, ignoring staff orders, refusing inspection of his restraints, flushing undergarments down the toilet, scattering food on the floor, urinating in the cell and spreading feces on the cell bars and walls, refusing to clean his cell and picking paint off the

_____

[4] Ambulatory restraints are defined by Federal Bureau of Prisons policy as "approved soft and hard restraint equipment which allow the inmate to eat, drink, and take care of basic human needs without staff intervention." (Doc. 156, Ex. 20, at 10).

[5] The parties dispute the frequency of the checks. Prisoners placed in ambulatory restraints are checked at two-hour intervals, (see Doc. 151, Ex. V, Ex. AA, at 200, Ex. BB, at 107-108; Doc. 156, Ex. 7), and medical staff check an inmate's restraints a minimum of twice per eight-hour shift for circulation and swelling problems. (Doc. 151, Ex. W, at 45-50). Womack asserts that the two-hour checks records indicate he was checked 78 times during his period in restraints, which, over 26 days, is less than half the required number of checks. (Doc. 156, Ex. 7).

walls. (Doc. 150 ¶¶ 132-135, 138, 145, 146, 150, 151, 155, 156, 159, 160, 161, 163; Doc.

155 ¶¶ 132-135, 138, 145, 146, 150, 151, 155, 156, 159, 160, 161, 163). Additionally,

Womack made threats that prison officials would be sorry if they removed his

restraints (Doc. 150 ¶¶ 136, 137, 140; Doc. 155 ¶¶ 136, 137, 140), and at one point,

Womack broke his left hand restraint. (Doc. 150 ¶ 139; Doc. 155 ¶ 139).

During the restraint period, a staff psychologist evaluated Womack and

confirmed that he was suffering from a personality disorder. Womack made clear

to the psychologist that he intended to remain disruptive. (Doc. 150 ¶ 142; Doc. 155

¶ 142). The psychologist concluded that Womack's actions appeared to be

"purposeful and calculated" attempts to exert control over his situation. (Doc. 150

¶¶ 141-142; Doc. 155 ¶¶ 141-142).

Over the twenty six day period, Womack claims he complained to staff

several times about losing the feeling in his arms and legs and about losing

circulation in his wrists. (Doc. 150, Ex. E ¶ 8; Doc. 156 Ex. 2, ¶ 8). In a declaration,

Womack asserts that his wounds were "big deep holes that were raw, and looked

like pink and white meat. They had a terrible odor. They hurt so much that I could

barely move. The parts of my hands and arms that were not in pain were numb

from lack of circulation." (Doc. 151, Ex. E ¶ 8; Doc. 156, Ex. 2 ¶ 8). However the

frequent medical checks lack any reference of either these complaints or any severe

injuries. (See Doc. 156, Ex. E). The records do indicate the following: Womack

complained about the circulation in his wrists on December 22, 2004. (Doc. 150 ¶

143; Doc. 155 ¶ 143). Staff noted that Womack's cuffs were tight and loosened the

hand restraints on December 24 and 25. (Doc. 150 ¶¶ 147, 149; Doc. 155 ¶¶ 147, 149).

At that point, staff cleaned and bandaged Womack's wrists and observed "mild

swelling." (Doc. 150 ¶ 149; Doc. 155 ¶ 149). On December 28, after Womack

requested the bandages on his wrists be changed, medical staff cleaned his wrist

abrasions. (Doc. 150 ¶¶ 151, 153; Doc. 155 ¶¶ 151, 153). Womack refused medical

staff attempts to check his wrist wounds on December 31, but Womack allowed

staff to clean the wrist abrasions the following day. (Doc. 150 ¶¶ 159, 162; Doc. 155

¶¶ 159, 162). On January 2, 2005, medical staff noted that Womack's wrists were

healing and he had no signs of infection. (Doc. 150 ¶ 163; Doc. 155 ¶ 163). When

Warden Smith ordered that Womack's restraints be removed on January 3, 2005,

medical staff evaluated Womack and determined that his only injuries were minor

abrasions on his ankle and wrists. (Doc. 150 ¶ 165; Doc. 155 ¶ 165). No infection was

present and medical attention was unnecessary. (Doc. 150 ¶ 164; Doc. 151 ¶ 164).

### C.    <u>USP Lewisburg Grievance Procedures</u>

When Womack arrived at USP Lewisburg in August of 2003, he received an

admission and orientation booklet titled "A&O Handbook, Rules and Regulations,

United States Penitentiary, Lewisburg, PA" ("Lewisburg handbook"). (Doc. 151,

Ex. C; Doc. 156, Ex. 1). The Lewisburg handbook describes the administrative

remedy procedures at USP Lewisburg. Prisoners are directed to first attempt to

resolve their complaints informally through a BP-8 form. (Doc. 151, Ex. C at 8; Doc.

156, Ex. 1 at 8). If informal resolution is unsuccessful, prisoners must submit a BP-9

formal complaint to the Correctional Counselor for delivery to the Associate

Warden's Secretary.  (Doc. 151, Ex. C, at 9; Doc. 156, Ex. 1, at 9).  The Lewisburg handbook provides that the BP-9 grievance form "must be filed within twenty (20) calendar days from the date on which the basis for the incident or complaint occurred, unless it was not feasible to file within that period of time."  (Doc. 151, Ex. C, at 9; Doc. 156, Ex. 1, at 9).[6]  An inmate may appeal an unsatisfactory response to the Regional Director within twenty (20) calendar days from the date of the BP-9 response.  (Doc. 151, Ex. C, at 9; Doc. 156, Ex. 1, at 9).  Appeal of the Regional Director's response is taken with the Central Office of the Bureau of Prisons and must be filed within thirty (30) calendar days of receipt of the Regional Director's response.  (Doc. 151, Ex. C, at 9; Doc. 156, Ex. 1, at 9).

When a prisoner believes his complaint is of "such a sensitive nature that he would be adversely affected if the complaint became known to the institution," the inmate may forward the complaint directly to the Regional Director, thus bypassing the institution's warden.  (Doc. 151, Ex. C, at 9; Doc. 156, Ex. 1, at 9).  If the complaint is not determined to be sensitive, it will be returned and the inmate may pursue the matter by filing a BP-9 complaint at the institution.  (Doc. 151, Ex. C, at 9; Doc. 156, Ex. 1, at 9).

---

[6] The USP Lewisburg Handbook differs from the administrative remedy procedures of the Bureau of Prisons ("BOP") codified in the Code of Federal Regulations.  See 28 C.F.R. § 542.  The BOP procedures in the Code of Federal Regulations do not include a feasibility exception to the twenty (20) calendar day filing requirement.  Id. § 542.14.

Womack was released from ambulatory restraints on January 3, 2005. However, from January 3, 2005 to February 4, 2005, Womack was held in a "boxcar" cell, located next to another "boxcar" cell with two inmates in it. (Doc. 156, Ex. 11, at 74-76; id. Ex. 12, at 114-115). "Boxcar" cells are more secure than regular cells. A "boxcar" cell is comprised of two separate cells aligned front to back. The inmate remains in the back cell, which has a steel grill as a door to the front cell. The front cell is empty and has a closed metal door that leads to the rest of the prison. (Doc. 156, Ex. 11, at 74-76; id. Ex. 12, at 114-115).

Womack is illiterate. (Doc. 156, Ex. 2 ¶¶ 14-16). To file grievances Womack relies on cell mates or other inmates to read and write for him and to prepare the forms. (Id.) Womack states that he does not trust prison officials to read and write for him. (Id. ¶ 16). According to Womack, Warden Smith knew Womack was illiterate because Warden Smith allegedly told Officer Gabrielson to tell Womack that "if I have a issue, for him to come and deal with it because of my literacy." (Doc. 150 ¶ 40; Doc. 155 ¶ 40). Womack states that after he was removed from restraints and was placed in the "boxcar" cell he "refused to have prison officials complete a grievance form for [him] because of the necessary conflict relating to [his] grievance against the prison officials." (Doc. 156, Ex. 2 ¶ 21).

On February 4, 2005, Womack was placed in a cell with a cell mate. (Doc. 150 ¶ 19; Doc. 155 ¶ 19). That day, when a case manager moved through the tier, Womack requested BP-8 and BP-9 forms to file a complaint. (Doc. 156, Ex. 16, at 260, 272). The case manager did not have any BP-8 or BP-9 forms at the time, but

an inmate across the cell block yelled to Womack to file a sensitive BP-10 form. (Id.) The case manager provided a BP-10 form which Womack had his cell mate fill out. (Id.) Womack tore up the BP-10 when it was returned to him rejected as non-sensitive sometime between February 17, 2005 and March 3, 2005. (Id.)

A case manager provided Womack with BP-8 and BP-9 grievance forms on February 19, 2005. (Doc. 156, Ex. 2 ¶ 23). On March 3, 2005, Womack filed an informal grievance (BP-8) claiming he was in ambulatory restraints for twenty-six days. (Doc. 150 ¶ 22; Doc. 155 ¶ 22). Staff responded the following day with a memo informing Womack that he did not request a remedy and asking him to resubmit his grievance specifically stating what he wanted resolved or addressed. (Doc. 150 ¶ 26; Doc. 155 ¶ 26). Instead of filing another informal grievance and requesting a remedy, on March 13, 2005, Womack submitted a formal BP-9 grievance to the warden. (Doc. 150 ¶ 28; Doc. 155 ¶ 28). Again, Womack did not request a remedy, and on April 1, 2005, Warden Smith provided a response "for informational purposes only." (Doc. 150 ¶ 30; Doc. 155 ¶ 30). On April 5, 2005, Womack submitted an appeal to the Regional Office, which was denied on grounds that Womack's original complaint was untimely. (Doc. 150 ¶¶ 31, 33; Doc. 155 ¶¶ 31, 33). On May 7, 2005, Womack filed an appeal to the Central Office, which was also denied on grounds that the original complaint was untimely. (Doc. 150 ¶¶ 34, 35; Doc. 155 ¶¶ 34, 35).

## B.    **Procedural History**

On December 7, 2006 Womack filed the instant <u>Bivens</u> action[7] against prison officials asserting that his maintenance in ambulatory restraints for twenty six days constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.  (<u>See</u> Doc. 1).  Defendants filed a motion to dismiss or, in the alternative, a motion for summary judgment.  (<u>See</u> Doc. 23).  This court treated the filing as a motion for summary judgment given the numerous documents outside the pleadings.  (<u>See</u> Doc. 50, at n.1).  The undersigned granted the motion on grounds that Womack had failed to exhaust his administrative remedies and alternatively, failed to put forth sufficient evidence to establish an Eighth Amendment violation.  (Doc. 50).

On appeal, the Third Circuit reversed.  <u>Womack v. Smith</u>, 310 Fed. App'x 547 (3d Cir. 2009).  The Third Circuit noted that the Lewisburg handbook, which has a feasibility exception not present in the BOP administrative remedy procedure in the Code of Federal Regulations, was not part of the summary judgment record before this court.  <u>Id.</u> at 550.  The court stated that applying the correct standard, questions remained as to whether Womack could *feasibly* file his grievance within the twenty-day period.  <u>Id.</u>  The Third Circuit also determined that this court erred in its alternative ruling on the Eighth Amendment.  <u>Id.</u> at 551.  Noting that the subjective state of mind of a prison official is a "critical inquir[y] in the Eighth

---

[7] <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971).

Amendment analysis," the Third Circuit concluded that summary judgment was inappropriate on the limited written discovery record and without the depositions of defendants "to discover what they knew and why they acted." Id.

Following remand, Womack filed an amended complaint on May 29, 2009 (see Doc. 62), and a second amended complaint (see Doc. 67) on June 22, 2009, in which he added five defendants. Subsequent to the disposition of two separate motions to dismiss (see Docs. 77, 80), the remaining defendants are: BOP Northeast Regional Director D. Scott Dodrill, Warden Joseph V. Smith, Corrections Officer Kenneth Gabrielson, and Captain John Oliver. (See Doc. 99). Discovery closed on July 1, 2010 (Doc. 125), and defendants filed the instant motion (Doc. 149) for summary judgment on September 30, 2010. Womack filed a brief in opposition (Doc. 154) on October 25, 2010, and defendants filed their reply thereto on November 8, 2010. (Doc. 159). The motion has been fully briefed and is ripe for disposition.

## II.  **STANDARD OF REVIEW**

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality. See FED. R. CIV. P. 56(c). The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-

moving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-

57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89

(1986); see also FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause

of action proceed.  Pappas, 331 F. Supp. 2d at 315.

## III.  **DISCUSSION**

Defendants allege that Womack failed to exhaust his administrative remedies

as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a).[8]  In

the alternative, defendants assert that they are entitled to qualified immunity.  The

court will address these issues *in seriatum.*

### A.  **Administrative Exhaustion**

Pursuant to the PLRA, a prisoner must submit to the administrative

grievance process as established by his or her place of incarceration prior to

seeking redress in federal court.  The Act specifically provides as follows:

> No action shall be brought with respect to prison conditions under
> section 1983 of this title, or any other Federal law, by a prisoner
> confined in jail, prison, or other correctional facility until such
> administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  A prisoner must comply with the exhaustion requirement as to

*any* claim that arises in the prison setting, regardless of the nature of the claim or of

the relief sought.  See Porter v. Nussle, 534 U.S. 516, 532 (2002); Booth v. Churner,

532 U.S. 731, 741 n.6 (2001) ("[A]n inmate must exhaust irrespective of the forms of

---

[8] Failure to exhaust is an affirmative defense for which defendants bear the
burden of proof.  Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002).

relief sought and offered through administrative avenues."). "[I]t is beyond the power of [any] court . . . to excuse compliance with the exhaustion requirement, whether on ground of futility, inadequacy or any other basis." <u>Nyhuis v. Reno</u>, 204 F.3d 65, 73 (3d Cir. 2000) (citing <u>Weinberger v. Salfi</u>, 422 U.S. 749, 766 (1975)); <u>see also</u> <u>Nyhuis</u>, 204 F.3d at 71 (stating that the PLRA "completely precludes a futility exception to its mandatory exhaustion requirement").

Whether a prisoner has exhausted his administrative remedies is a question of law to be determined by the court. <u>See</u> <u>Drippe v. Tobelinski</u>, 604 F.3d 778, 781-82 (3d Cir. 2010) (citing <u>Pavey v. Conley</u>, 544 F.3d 739 (7th Cir. 2008)). Factual disputes as to whether a prisoner has exhausted his remedies do not convert the exhaustion question into a jury matter; the court must resolve any factual disputes and determine whether exhaustion requirements have been satisfied. <u>Id.</u>; <u>see also</u> <u>McErlean v. Merline</u>, Civ. No. 07-5681, 2010 WL 5071328, at * 5 (D.N.J. Dec. 7, 2010).[9]

The court must consider: (1) whether the prisoner has exhausted his or her administrative remedies "in the literal sense," in other words, "whether further

_____

[9] On appeal from the court's initial grant of summary judgment, the Third Circuit stated that "a reasonable factfinder might conclude that it was not feasible for Womack to file his initial grievance within 20 days of his release from the ambulatory restraints, and, therefore, might determine that his initial grievance was timely." <u>Womack</u>, 310 Fed. App'x at 550-51. Similarly, Womack argues that genuine issues of material fact remain as to whether he properly exhausted his available administrative remedies. (Doc. 154, at 15-25). However, subsequent to the Third Circuit's opinion in <u>Womack</u>, the court decided <u>Drippe v. Tobelinski</u>, 604 F.3d 778, 781-82 (3d Cir. 2010), which agreed with the Seventh Circuit's decision in <u>Pavey v. Conley</u>, 544 F.3d 739 (7th Cir. 2008), that a an inmate is not entitled to a jury trial on factual disputes related solely to exhaustion. <u>Drippe</u>, 604 F.3d at 781-82. Thus, the court is the factfinder on exhaustion.

13

avenues of relief are available to him [or her] within the prison's inmate grievance process," and (2) whether the prisoner has procedurally defaulted his or her claims. Spruill v. Gillis, 372 F.3d 218, 232 (3d Cir. 2004). There is no dispute that Womack literally exhausted his administrative remedies, and the court's discussion of literal exhaustion in its prior opinion stands. (See Doc. 50, at 11). At issue is whether Womack procedurally defaulted his claims. "Prison grievance procedures supply the yardstick for measuring procedural default." Spruill, 372 F.3d at 231. Defendants assert that Womack procedurally defaulted because he failed to file his initial grievance within twenty days of release from ambulatory restraints—the period from January 3, 2005 to January 23, 2005—when Womack was housed in the "boxcar" cell. Defendants contend that it was feasible for Womack to file in this period. They assert that Womack simply chose not to request forms or assistance from prison officials. Defendants also point out that Womack had access to inmates in the adjoining boxcar cell and could communicate with these inmates through the air vents. Womack counters that (1) he did not procedurally default—he timely filed his initial grievance and all appeals; and (2) if he procedurally defaulted, it was not feasible for him to file within the time period required for grievances due to his illiteracy, his placement in the "boxcar" cell without an inmate to assist him, the sensitive nature of his grievance, and his lack of trust in prison officials.

### 1.    **Whether Womack's Initial Grievance was Timely**[10]

Womack claims that the filing of his initial grievance was timely.  First, Womack asserts that there is no deadline for the filing of a sensitive BP-10 grievance, and thus, when he filed such a grievance on February 7, 2005, it was timely.  Second, Womack contends that  Warden Smith followed an unwritten policy which was more lenient than the administrative grievance deadlines set forth in the Lewisburg handbook.  Specifically, Womack asserts that Warden Smith worked with inmates who filed grievances beyond the hard deadlines set forth in the Lewisburg handbook, and, in the instant matter, accepted Womack's BP-9 grievance, filed on March 13, 2005, as timely.

### a.    **The Sensitive BP-10**

Womack argues that the Lewisburg handbook sets forth no time constraints for filing a sensitive complaint (the BP-10) with the regional office.  Thus, he claims

---

[10] Defendants assert that the court should not address anew whether Womack's initial grievance was timely, as it previously determined the initial grievance to be untimely and the Third Circuit remanded solely for a determination of the *feasibility* of filing a timely grievance.  In a nutshell, defendants argue that the court's prior determination is the law of the case.  See Quern v. Jordan, 440 U.S. 332, 347 n.18 (1979) (under law of the case doctrine, court will not revisit issue already decided in the same litigation); American Civil Liberties Union v. Mukasey, 534 F.3d 181, 187 (3d Cir. 2008).  The court rejects this argument.  When the court decided the prior motion, the court was not privy to the Lewisburg handbook grievance procedures and the record did not contain documentation regarding Womack's sensitive BP-10 filing.  In light of this new information, the court will revisit its prior analysis.  See Castro v. United States, 540 U.S. 375, 384 (2003) (reiterating that law of the case doctrine "simply 'expresses' common judicial 'practice'; it does not 'limit' the courts' power"); Arizona v. California, 460 U.S. 605, 618 n.8 (1983) (court may depart from prior holding if convinced it is clearly erroneous or would work a manifest injustice).

that when he filed his BP-10 on February 7, 2005, his filing was timely. The court rejects this argument. The Lewisburg handbook is actually quite clear. It states that a "BP-9 *complaint* must be filed within twenty (20) calendar days" of the incident. (Doc. 15, 1 Ex. C, at 9; Doc. 156, Ex. 1, at 9) (emphasis added). The manual describes the process for appealing unsatisfactory responses, and in the last paragraph of the section states that "[i]f an inmate believes a *complaint* is of such a sensitive nature that he would be adversely affected if the complaint became known in the institution, he may file the complaint directly to the Regional Director." (Doc. 151, Ex. C, at 9; Doc. 156, Ex. 1, at 9) (emphasis added). Thus, the time constraint generally applies to <u>all</u> complaints, and the subsection concerning sensitive complaints neither alters or waives that time constraint. The Program Statement distributed by the BOP explaining the administrative remedy program also belies the claim that there is no deadline for filing a BP-10 form. (<u>See</u> Doc. 151, Ex. L, at 7). The memo instructs that the Warden "shall allow a reasonable extension of time" for resubmission of the grievance at the location of incarceration when a sensitive BP-10 grievance request is denied as non-sensitive. (<u>Id.</u>) This clearly indicates that BP-10 grievances are subject to the same twenty-day deadline as BP-9 grievances, and that deadline is to be extended when the regional office rejects a BP-10 as non-sensitive.

Accepting Womack's argument that the BP-10 has no deadline would allow prisoners to defeat a critical function of the administrative procedures process, namely: to provide repose and avoid stale claims. Prisoners could avoid procedural

default simply by filing a BP-10 form, claiming that his or her grievance is sensitive. The handbook is unambiguous. Whether the complaint is ordinary or sensitive, it must be filed within twenty days, unless infeasible. Womack's BP-10, filed on February 7, 2005, was not timely.

### b. **Warden's Smith Informal Policy**

Womack also asserts that Warden Smith had an informal policy of working with prisoners with legitimate grievances and that Warden Smith accepted Womack's BP-9 as timely. (Doc. 154, at 19). Warden Smith testified at his deposition that prison officials would attempt to work with inmates when they understood the prisoner could not file a grievance in a timely manner. (Doc. 156, Ex. 13, at 198). If prison officials believed there was a legitimate reason for the delay, they would entertain the grievance. (Id. at 199). Warden Smith further testified that illiteracy could be a legitimate reason; as an example Warden Smith stated that prison officials would excuse delays attributable to an inmate's language barrier that necessitates assistance from bilingual staff. (Id.)

In the instant matter, Warden Smith responded to Womack's BP-9 formal grievance filed on March 13, 2005, but stated his response was for information purposes only, as Womack failed to request a remedy. (Doc. 151, Ex. O). Womack contends that Warden Smith's deposition testimony and his response to the BP-9 grievance, in which he did not expressly reject the BP-9 as untimely, show that Warden Smith had a policy of accepting legitimate grievances as timely and accepted Womack's grievance as timely.

17

The court is not persuaded that Warden Smith had an informal policy that controverted the Lewisburg handbook grievance procedures.  Nor is the court convinced that Warden Smith accepted Womack's filing as timely because he did not explicitly deny it as untimely.  Indeed, no inference about timeliness may be gleaned from the response.  Womack's BP-9 form failed to request any remedy and, consequently, the timeliness of the grievance was a non-issue.  With respect to the alleged informal policy, Warden Smith's discussion of this subject is less than definitive—a mere two pages out of hundreds of pages of transcript.  Furthermore, the example given by Warden Smith, in which a language barrier was excused, is consistent with BOP regulations and program statements requiring Wardens to provide assistance to those inmates who are illiterate or disabled.  (<u>See</u> Doc. 151, Ex. L, at 9).  It does not indicate an informal policy.

In the instant matter, Womack asserts that he did not trust prison officials to help him file grievances, not that he sought help and help was withheld or delayed.  Under the Lewisburg handbook grievance procedure, Womack's initial grievance was untimely.

## 2.    <u>Feasibility of Filing a Timely Grievance</u>

Prison officials removed Womack's ambulatory restraints on January 3, 2005.  Pursuant to the Lewisburg handbook, Womack's initial grievance should have been filed by January 23, 2005.  The court's analysis of feasibility is thus focused on whether it was feasible to file a grievance between January 3, and January 23, 2005, and if not, when it became feasible.

18

Womack asserts that it was not feasible for him to file a timely grievance because prison officials placed him in an "boxcar" cell after his removal from restraints where he remained without a cell mate until February 4, 2005. Although Womack was informed that Warden Smith knew of his illiteracy and was willing to provide assistance, Womack asserts that he did not ask prison staff to assist him because "of the necessary conflict relating to [his] grievance against the prison officials." (Doc. 156 Ex. 2 ¶ 21). Womack does not allege that he was unable to access grievance forms from his "boxcar" cell. Consistent with his infeasibility argument, Womack claims that he requested materials for filing a grievance immediately upon his assignment to a cell with a cell mate. He further alleges that prison officials did not provide him with grievance forms until February 19, 2005. (Doc. 154, at 23).[11] Womack asserts that he could not request the assistance of staff in filing the BP-10 because such action would defeat the very purpose of a sensitive BP-10 grievance. (Doc. 154, at 24).

BOP regulations require wardens to provide assistance to illiterate inmates in the preparation and filing of grievances and appeals. See 28 C.F.R. § 542.16(b)

---

[11] Defendants assert that this court's prior opinion (Doc. 50) rejecting Womack's claims that he could not file his initial grievance within twenty days remains the law of the case. (Doc. 151, at 9 n.3). This argument is rejected. The court's prior opinion did not address, in any manner, *feasibility* of filing within twenty days per the Lewisburg handbook, as this significant piece of evidence was not part of the record before me. Indeed, the Third Circuit declined to "decide what significance, if any, the fact of Womack's illiteracy has in determining the feasibility of filing his grievance within 20 days." Womack, 310 Fed. App'x at 551 n.9.

("Wardens shall ensure that assistance is available for inmates who are illiterate . . . . Such assistance includes provision of reasonable accommodation in order for an inmate with a disability to prepare and process a Request or an Appeal."). However, illiteracy does not excuse an inmate's failure to exhaust when an inmate does not request assistance. <u>See</u> <u>Ramos v. Smith</u>, 187 Fed. App'x 152, 154 (3d Cir. 2006); <u>see</u> <u>also</u> Program Statement, Doc. 151 Ex. L, at 9 (explaining 28 C.F.R. § 542.16(b) and stating that "Wardens must ensure that staff . . . provide assistance in the preparation or submission of an Administrative Remedy or an Appeal *upon being contacted by such inmates* that they are experiencing a problem") (emphasis added).

Given the totality of the circumstances, the court finds that it was not feasible for Womack to file his grievance earlier. In isolation, Womack's lack of trust for prison officials does not excuse his untimely filing on futility grounds. <u>See</u> <u>Nyhuis</u>, 204 F.3d at 71 (PLRA "completely precludes futility exception"). However, in light of Womack's illiteracy, his twenty six days of ambulatory restraints, and his continued separation from other prisoners for another thirty days, and his reasonable reluctance to seek assistance from prison officials, the court concludes that an aggregation of obstacles prevented Womack from timely filing. That Womack did not waste any time filing a grievance when placed with a cell mate supports this conclusion. Indeed, the very day Womack had access to a cell mate he requested grievance forms, and he submitted his sensitive grievance three days later. When he subsequently received the BP-8 and BP-9 complaint forms,

20

Womack promptly completed and filed them with assistance. Under the unique facts of this case, the court concludes that Womack properly exhausted his administrative remedies pursuant to grievance provisions of the Lewisburg handbook.

### B. **Qualified Immunity**[12]

Defendants next assert that they are entitled to qualified immunity. Qualified immunity provides not merely a "defense to liability," but rather, "immunity from suit." Hunter v. Bryant, 502 U.S. 224, 227 (1991) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). It is therefore important to "resolv[e] immunity questions at the earliest possible stage in the litigation." Pearson v. Callahan, 555 U.S. 223, ---, 129 S. Ct. 808, 815 (2009) (quoting Hunter, 502 U.S. at 227). Certain officials performing "discretionary functions," are shielded from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, ---, 129 S. Ct. at 815 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); see also

---

[12] Womack asserts that the Third Circuit declined to apply qualified immunity and ordered this case to proceed, thus, "applying qualified immunity at this stage would flout the Third Circuit's ruling in this case." (Doc. 154, at 26). Womack misapprehends the Third Circuit's opinion. To clarify, the Third Circuit held that summary judgment was unwarranted on the limited factual record. The Circuit Court did not conclusively reject the defense of qualified immunity. Womack v. Smith, 310 Fed. App'x. 547, 551 (3d Cir. 2009). On a related issue, I note that my denial of qualified immunity, asserted by defendants in their the motions to dismiss subsequent to the remand from the Third Circuit, does not preclude reconsideration of the qualified immunity defense at the summary judgment stage. Reconsideration of qualified immunity is appropriate on the fully developed factual record now before the court.

Wilson v. Layne, 526 U.S. 603, 609 (1999). If such an official reasonably believes his conduct to be lawful, he is protected by qualified immunity, which affords "ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Kelly v. Borough of Carlisle, 622 F.3d 248, 254 (3d Cir. 2010) (quoting Hunter, 502 U.S. at 229).

Application of qualified immunity implicates two distinct inquiries. The first inquiry evaluates whether the defendant violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201-02 (2001), abrogated in part by Pearson, 555 U.S. 223; Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007); Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006). If the plaintiff fails to put forth evidence that the defendant committed a constitutional infraction, then the court must dispose of the claim in the defendant's favor. Saucier, 533 U.S. at 201; see also Wilson, 526 U.S. at 609. However, if the evidence shows that the defendant committed a constitutional violation, the second inquiry assesses whether the right in question was "clearly established" at the time the defendant acted. Pearson, 129 S. Ct. at 815-16; Saucier, 533 U.S. 201-02. A right is "clearly established" if a reasonable actor under the circumstances would have known that his or her conduct impinged upon constitutional mandates. Pearson, 129 S. Ct. at 815-16; Williams, 455 F.3d at 191. Hence, a defendant may not invoke qualified immunity if the defendant's conduct diverges from that of a reasonable actor under the circumstances. Williams, 455 F.3d at 191. The court is not required to conduct these inquiries sequentially. Pearson, 129 S. Ct. at 820. The court may eschew difficult constitutional issues and award qualified immunity to a defendant

if it is apparent that the defendant did not violate rights that were *clearly established* at the time the defendant acted.  Id.

If immunity is raised at the summary judgment stage, and if the court chooses to address the plaintiff's showing of constitutional violations—the first inquiry described above—then the court's analysis of the alleged violations essentially merges with its analysis of the merits.  See Gruenke v. Seip, 225 F.3d 290, 299-300 (3d Cir. 2000); Russoli v. Salisbury Twp., 126 F. Supp. 2d 821, 838-41 (E.D. Pa. 2000); see also Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).").

## A.    **Whether Defendants Violated Womack's Eighth Amendment Rights**

The Eighth Amendment protects prisoners from cruel and unusual punishment, including "the unnecessary and wanton infliction of pain."  Hudson v. McMillian, 503 U.S. 1, 5 (1992) (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)); see also U.S. CONST. amend. VIII.  To prevail on an Eighth Amendment claim, an inmate must show: (1) a deprivation that is objectively sufficiently serious; and (2) "a sufficiently culpable state of mind" of the defendant official.  See Farmer v. Brennan, 511 U.S. 825, 834 (1994).

There are separate standards for Eighth Amendment violations depending on the type of claim.  An Eighth Amendment challenge to prison conditions is

subject to the deliberate indifference standard.  See Fuentes v. Wagner, 206 F.3d

335, 345 (3d Cir. 2000) (citing Farmer, 511 U.S. at 837).  Prison officials are

deliberately indifferent when they know of and disregard a substantial risk of

serious harm to a prisoner.  Farmer, 511 U.S. at 836.  Furthermore, a prisoner must

produce evidence of serious or significant physical or emotional injury resulting

from a challenged prison condition.  Shakka v. Smith, 71 F.3d 162, 166 (4th Cir.

1995).  An Eighth Amendment challenge asserting excessive force is subject to a

malicious and sadistic standard.   The inquiry under this standard is whether prison

officials applied force "in a good faith effort to maintain or restore discipline or

maliciously and sadistically for the very purpose of causing harm."  Hudson, 503

U.S. at 6 (citations and quotations omitted); see also Fuentes, 206 F.3d at 345.  In an

excessive force case, a prisoner need not show significant injury; however, *de

minimis* uses of physical force are insufficient to establish an Eighth Amendment

violation.  Hudson, 503, U.S. at 9-10.  Excessive force claims are typically based in

emergency situations where prison officials must use force and act quickly and

decisively to maintain or restore discipline.  See Hudson, 503 U.S. at 6-7.

Although, the initial use of restraints may properly be characterized as an

excessive force claim, the court concludes that the prolonged use of restraints at

issue here is more properly analyzed under the deliberate indifference standard.

See A.M. ex. rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 587 (3d.

Cir. 2004) (deliberate indifference standard appropriate where it did not appear that

officials "were required to make split-second decisions to maintain or restore order

24

through the use of excessive physical force"); <u>Howard v. Bureau of Prisons</u>, Civ. A. No. 3:05-CV-1372, 2008 WL 318387, at *13 (M.D. Pa. Feb. 4, 2008) ("Outside the context of a prison disturbance, which is characterized as 'a single instance of prisoner unrest where there is a need to act quickly,' Eighth Amendment claims are judged by the deliberate indifference standard."); <u>Trammell v. Keane</u>, 338 F.3d 155, 162-63 (2d Cir. 2003) (applying deliberate indifference standard in determining whether deprivation orders, depriving prisoner of certain amenities, were reasonably calculated to restore prison discipline and security).  <u>But</u> <u>see</u> <u>Zimmerman v. Schaeffer</u>, 645 F. Supp. 2d 226, 248 (M.D. Pa. 2009).[13]

A prisoner must show extreme deprivations to make out a viable conditions-of-confinement claim.  <u>Hudson</u>, 503 U.S. at 9.  "[O]nly those deprivations denying 'the minimal civilized measures of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation."  <u>Hudson</u>, 503 U.S. at 9 (quoting <u>Wilson</u>, 501 U.S. at 298 (quoting <u>Rhodes v. Chapman</u>, 452 U.S. 337, 346 (1981))).  A

---

[13] In <u>Zimmerman v. Schaeffer</u>, 654 F. Supp. 2d 226 (M.D. Pa. 2009), the Honorable Sylvia Rambo concluded that, in the factual circumstances of that case, the use of restraints was more appropriately viewed as an excessive force case.  <u>Id.</u> at 248-49.  There, the application of restraints was "closely connected to the use of force in initially subduing Plaintiffs in each incident, and in all cases, a lengthy application of mechanical restraints was authorized in advance."  <u>Id.</u> at 249.  In the present matter, the court finds the deliberate indifference standard to be appropriate given the divergent factual circumstances.  Here, the initial use of force against Womack was unplanned and there is no evidence in the record to suggest that USP Lewisburg officials intended a lengthy restraint period.  The court also notes with interest that the Third Circuit referenced *only* the deliberate indifference standard in its initial review of Womack's Eighth Amendment claim.  <u>See</u> <u>Womack v. Smith</u>, 310 Fed. App'x 547, 551 (3d Cir. 2009).

prisoner's Eighth Amendment rights are violated when prison officials "act[] or fail[] to act with deliberate indifference to a substantial risk of serious harm to a prisoner." <u>Farmer</u>, 511 U.S. at 836; <u>Kaucher v. Cnty. of Bucks</u>, 455 F.3d 418, 427 (3d Cir. 2006). The test is subjective:

> [A] prison official cannot be found liable . . . unless the prisoner knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

<u>Farmer</u>, 511 U.S. at 837; <u>see</u> <u>also</u> <u>Fuentes</u>, 206 F.3d at 345 & n.12. A prison official's subjective state of mind can be inferred when the risk of harm is obvious. <u>See</u> <u>Hope v. Pelzer</u>, 536 U.S. 730, 738 (2002); <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120, 133 (3d Cir. 2001) (stating that "subjective knowledge on the part of the official can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk"). The length of confinement in the challenged prison condition is a relevant factor in Eighth Amendment analysis. <u>See</u> <u>Hutto v. Finney</u>, 437 U.S. 678, 686 (1978); <u>Hope v. Pelzer</u>, 536 U.S. 730 (2002); <u>Holley v. Johnson</u>, No. 7:08CV00629, 2010 WL 2640328, at *12 (W.D. Va. June 30, 2010). On a motion for summary judgment, the court must determine whether a reasonable trier of fact could conclude that an Eighth Amendment violation has occurred.

Defendants assert that they cannot be held deliberately indifferent as to the health and safety of Womack because they relied upon and deferred to prison medical staff, who were constantly monitoring Womack's medical condition. (Doc.

26

151, at 23-24).  In <u>Durmer v. O'Carroll</u>, 991 F.2d 64, 69 (3d Cir. 1993), the Third

Circuit held that summary judgment was appropriate in favor of two defendants

who did not respond to medical complaints of a prisoner who was already being

treated by the prison physician.  As neither defendant was a physician, the court

concluded that they could not be considered deliberately indifferent to the

prisoner's medical complaints.  <u>Id.</u>; <u>see</u> <u>also</u> <u>Ayala v. Terhune</u>, 195 Fed. App'x 87, 91

(3d Cir. 2006) (prison administration cannot be found deliberately indifferent under

Eighth Amendment where they fail to respond to medical complaints of prisoner

being treated by physician, or when, as non-physicians, they refer to the medical

judgment of a physician).

Nonetheless, the court concludes that there remains disputed issues of

material fact as to whether defendants were deliberately indifferent to an excessive

risk to Womack's health and safety.  Womack asserts that the ambulatory restraints

caused big, deep, raw wounds that had a terrible odor.  (Doc. 156, Ex. 2 ¶ 8).  He

claims there was blood around his wrists that would drop on his clothes and on the

floor.  (Doc. 151, Ex. B, at 58-64).  Womack asserts that he was unable to lie down

flat, to bathe, or to clean himself after use of the facilities.  (Doc. 156, Ex. 2 ¶ 4).  He

claims he complained to prison officials and medical staff several times about losing

feeling in his arms and legs and circulation in his wrists.  (<u>Id.</u> ¶ 8).  According to

Womack, prison officials ignored his complaints and requests for medical attention.

Although defendants deny that Womack complained of such injuries, that

they ignored Womack's complaints, or that he suffered any serious injuries,

27

resolution of defendants' state of mind is inappropriate at the summary judgment stage because it is inherently a question of fact that turns on credibility. <u>See</u> <u>Young v. Quinlan</u>, 960 F.2d 351, 360 n.21 (3d Cir. 1992). Taking this evidence in the light most favorable to the nonmoving party and making all reasonable inferences therefrom, the court concludes that a reasonable jury could find, if they believe Womack's testimony, that defendants were deliberately indifferent to a substantial risk of serious harm to Womack in violation of the Eighth Amendment, and that the harm was obvious. Therefore, the court must move to the second prong of the qualified immunity analysis and determine whether the right was clearly established.

**B.    <u>Whether Womack's Rights Were Clearly Established</u>**

To determine whether a government official is entitled to qualified immunity, the court must ascertain "whether a reasonable public official would know that his or her specific conduct violated clearly established rights." <u>Grant</u>, 98 F.3d at 121 (citing <u>Anderson v. Creighton</u>, 483 U.S. 635, 636-37 (1987)). The Supreme Court has warned against conceptualizing an individual's rights at too distant a "level of generality," and it has held that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Anderson</u>, 483 U.S. at 639-40; <u>McKee v. Hart</u>, 436 F.3d 165, 171 (3d Cir. 2006). The court must examine whether the defendant should have known that his or her actions contravened statutory or constitutional guarantees. <u>Gruenke</u>, 225 F.3d at 299-300. "This is not to say that an official action is protected by qualified immunity

28

unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." <u>Anderson</u>, 483 U.S. at 640 (citation omitted).   Thus, whether a right is clearly established is a fact specific inquiry undertaken in the context of the case.  <u>See</u> <u>McKee</u>, 436 F.3d at 171.

Defendants claim that maintaining Womack in ambulatory restraints for twenty six days was not an obvious violation of his Eighth Amendment rights.  They assert that "no court has ever held that the use of 'ambulatory restraints' is unconstitutional for any amount of time," and note that inmates are often transported in ambulatory restraints, some trips taking numerous days.  (Doc. 151, at 22).

Admittedly, '[t]here are relatively few cases dealing with keeping an inmate in handcuffs for a prolonged period of time." <u>Barker v. Goodrich</u>, No. 2:07-CV-946, 2010 WL 55719 (S.D. Ohio Jan. 4, 2010).  Despite the paucity of factually similar precedent, a defendant may be on notice that his conduct violates clearly established law in novel factual circumstances <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002).

In <u>Hope v. Pelzer</u>, the Supreme Court found that restraining an inmate to a hitching post for seven hours violated a clearly established constitutional right.  The prisoner in <u>Hope</u> was restrained for seven hours, in a standing position, with his shirt off, subject to sunburn and scorching heat, without water or bathroom breaks and taunted by corrections officers.  <u>Id.</u> at 734-35.  The Court found that a

29

reasonable person would have known this conduct to be in clear violation of the Eighth Amendment. Id. at 741-42. The Court also referenced state correctional facility regulations, Eleventh Circuit precedent, and a Department of Justice report advising of the "constitutional infirmity" of hitching posts, in support of its conclusion. Id. at 741-42.

In the instant matter, defendants cite to cases involving the prolonged restraint of prisoners in handcuffs or ambulatory restraints in which courts have held there was no clearly established Eighth Amendment violation, even post-Hope. However, none of those cases approximate the factual circumstances in the instant matter. In Holley v. Johnson, No. 7:08CV00629, 2010 WL 2640328 (W.D. Va. June 30, 2010), an inmate alleged that his Eighth Amendment rights were violated when he was held in ambulatory restraints for forty-eight (48) hours. The court held that Holley failed to show a significant or serious injury as he was free to change position extensively while in ambulatory restraints and the injuries to his wrists did not require medical treatment. Id. at *13. The court called Holley's condition a "temporary discomfort[] and inconvenience[]." Id. In Barker v. Goodrich, the Southern District of Ohio held that defendants who placed the prisoner in handcuffs for twelve hours were entitled to qualified immunity because they were not on fair notice that their conduct violated the Eighth Amendment. Barker, 2010 WL 55719, at *5; see also Fuentes, 206 F.3d at 342-43 (upholding jury verdict in favor of defendants where inmate had been confined in restraint chair for eight hours).

In fact, the court has not identified a single case in which an inmate was held in ambulatory restraints (or any other type of restraints) for more than three days. See Key v McKinney, 176 F.3d 1083, 1086 (8th Cir. 1999) (no Eighth Amendment violation where prisoner handcuffed and shackled for 24 hours); Hunter v. Bledsoe, 2010 WL 3154963 (M.D. Pa. Aug. 9, 2010) (ambulatory restraints used for 24 hours); Holley, 2010 WL 2640328 (ambulatory restraints used for 48 hours); Moore v. Miller, No. 7:08CV00614, 2009 WL 113258 (W.D. Va. Jan. 15, 2009) (26 hours); Keyes v. O'Brien, No. Civ. A. 7:06CV00437, 2006 WL 2125912 (W.D. Va. July 27, 2006) (no Eighth Amendment violation where prisoner placed in ambulatory restraints for 30 hours); Garraway v. United States, No. 04-CV-01049, 2006 WL 3054606, at *8 (D. Colo. July 24, 2006) (50 hours in ambulatory restraints); Saleh v. Ray, No. Civ. A. 02-3214, 2003 WL 23484639, at * 6 (D. Kan. 2003) (24 hours in ambulatory restraints, no Eighth Amendment violation); see also Zimmerman, 654 F. Supp. 2d at 232 (19 hours or more in restraint chair). In the instant matter, plaintiff Womack remained in restraints for twenty six consecutive days. Like Hope, the court finds such conduct an "arguably obvious" violation of the Eighth Amendment. See Hope, 536 U.S. at 741 ("Arguably, the violation was so obvious that our own Eighth Amendment cases gave respondents fair warning that their conduct violated the Constitution.").

The court's conclusion is buttressed by the special reporting requirements implicated whenever an inmate is placed in restraints for more than eight hours. (Doc. 156, Ex. 20, at 9). It is undisputed that the prolonged restraint of Womack

31

compelled defendants to provide frequent status reports to the regional offices. (See id. Ex. 11, at 170). Prison regulations also required constant monitoring of prisoners in restraints. (Doc. 151, Ex. W, 45-50; Doc. 156, Ex. 20). Hope indicates that excessive, prolonged restraint of inmates violates the Eighth Amendment. Notwithstanding the significant factual distinctions between Hope and the present matter, a reasonable official in defendants' position would have known that placing Womack in restraints for 26 days violated the Eighth Amendment. Taking Hope together with the BOP regulations regarding use of ambulatory restraints, defendants had fair notice that their alleged conduct, if proven true, violated a clearly established right under the Eighth Amendment. Thus, the court rejects the defense of qualified immunity based upon the summary judgment record.

## IV.    CONCLUSION

The court concludes that it was not feasible for Womack to file his initial grievance within twenty days after his release from ambulatory restraints, and when it became feasible, he properly exhausted his administrative remedies pursuant to the PLRA. Additionally, the court finds that defendants are not entitled to qualified immunity. Therefore, defendants' motion (Doc. 149) for summary judgment will be denied.

An appropriate order follows.

                                        S/ Christopher C. Conner
                                        CHRISTOPHER C. CONNER
                                        United States District Judge

Dated:        March 2, 2011

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAVID LEE WOMACK,** | : | **CIVIL ACTION NO. 1:06-CV-2348** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **JOSEPH V. SMITH, KENNETH** | : | |
| **GABRIELSON, D. SCOTT DODRILL** | : | |
| **and JOHN OLIVER,** | : | |
| | : | |
| **Defendants** | : | |

## <u>ORDER</u>

AND NOW, this 2nd day of March, 2011 upon consideration of defendants'

motion (Doc. 149) for summary judgment, and for the reasons set forth in the

accompanying memorandum, it is hereby ORDERED that the motion is DENIED.

The matter shall be set for trial forthwith.


   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge